A91A1681, A91A1682. INTERAGENCY, INC. et al. v. DANCO FINANCIAL CORPORATION; and vice versa.

(417 SE2d 46)

Beasley, Judge.

This suit for conversion, misrepresentation, and violation of the Georgia Racketeer Influenced & Corrupt Organizations Act (RICO), OCGA § 16-14-1 et seq., stems from a dispute over the setting up of a travel agency. The appeal (A91A1681) and cross-appeal (A91A1682) follow a four-day jury trial which resulted in judgment for plaintiff Danco Financial Corporation.

The jury awarded $25,500 in treble damages as civil remedy for violation of RICO, see OCGA §§ 16-14-4; 16-14-6 (c), plus $11,200 in attorney fees jointly and severally against each of the defendants InterAgency, Inc., Hanner, and Misiak. Plaintiff accepted a write-off of the awarded attorney fees rather than face the new trial which had been conditionally granted. The court entered judgment for plaintiff for $25,500 and pre-judgment interest on the $8,500 of actual damages, plus costs.

In A91A1681, defendants challenge the trial of the case as a state civil RICO claim. They maintain that the admissible evidence showed that the case was merely "a simple, garden-variety, $8,500 civil dispute," rather than the plaintiff's portrayal, stained by illegal evidence, of a systematic defrauding of numerous victims.

In A91A1682, plaintiff challenges the write-off of attorney fees.

*Case No. A91A1681*

The gravamen of defendants' challenge, although there is also a protest to a portion of the jury charge, is that the trial court allowed evidence which was improper and insufficient to establish the predicate acts required under OCGA § 16-14-3 (2) [now subsection (8)] to show a "pattern of racketeering activity." The complaint alleged that InterAgency and its agents, Hanner and Misiak, and all of them in conspiracy with one another, conducted and participated in an enterprise through a pattern of racketeering activity as defined in OCGA § 16-4-3, by engaging in wire fraud in violation of 18 USC § 1343, mail

fraud in violation of 18 USC § 1341, and theft by deception in violation of OCGA § 16-8-3. The consolidated pre-trial order which superseded the pleadings added that defendants engaged in theft by conversion under OCGA § 16-8-4.

"Georgia's RICO act, while it has similarities to the federal RICO statute, has a number of significant differences. 'The Georgia RICO statute is significantly broader than its federal counterpart in that OCGA § 16-14-4 (a) makes it unlawful for any person through (a pattern of racketeering activity or) proceeds derived from a pattern of racketeering activity to acquire or maintain any real property, or personal property of any nature, including money. In contrast, the federal RICO statute, 18 USC § 1962 (a), only targets investors who participate in the pattern of racketeering activity as a principal. See "Georgia Racketeer Influenced and Corrupt Organizations Act," 20 Ga. St. B.J. 34 (1983). And, 18 USC § 1962 (b) only makes it unlawful for any person through a pattern of racketeering activity to acquire or maintain any interest in or control of an enterprise; the federal statute does not contain a proscription against the acquisition of real and personal property, including money, which is not part of the enterprise. . . . 18 USC § 1962 (c), and . . . OCGA § 16-14-4 (b), are similar in that the . . . core provisions both make it unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity. In one respect, the Georgia RICO statute is narrower than the federal statute, in that OCGA § 16-14-3 (2) [now subsection (8)] defines "pattern of racketeering activity" as "at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. . . ." The federal RICO statute, of course, requires a connection between the racketeering activity and the enterprise, but it does not on its face require any interrelatedness between the predicate crimes themselves. [Cit.]' [Cit.]" *Dover v. State*, 192 Ga. App. 429, 430 (1) (385 SE2d 417) (1989). "OCGA § 16-14-3 (2) [now subsection 8] defines 'pattern of racketeering activity' as engaging in 'at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. . . .' The Georgia statute requires the interconnectedness not contained in the wording of its federal counterpart." Id. at 432.

The evidence construed in favor of the verdict showed the following. Danco's president, Profit, who also operated a telecommunications business, wanted to acquire a travel agency so that Profit's companies could make reservations and ticket employee travel in-house.

One of Profit's employees knew of Hanner from Hanner's prior partnership in a travel agency. Hanner was president and sole stockholder of American Marketing and Communications Corporation (AMCC). Her husband, Misiak, was president of InterAgency, Inc.

In the fall of 1988, Profit contacted Hanner about acquiring the type of "full service" travel agency he desired, one which could book hotel, airline, and cruise reservations and write tickets for personnel and also for the general public. As the result of telephone conversations between the two, Profit was mailed a brochure which outlined the travel agency that InterAgency was offering for sale.

The brochure on its face advertised the "TravelBank" dealership; as a "full service travel agency," with the name "TravelBank" as a registered trademark of InterAgency. The brochure furnished information including the following. *TravelBank was launching a nationwide network of full service travel agencies as dealerships. *Dealers would have a professional reservation service center, start-up assistance, ongoing expertise and sales direction. *TravelBank's staff of well trained reservationists would book dealership customers on the lowest airline, hotel and car rental rates. *The network would provide the individual ownership incentives and advantages of a "mega-agency." *TravelBank full service dealership was different than the franchise system by which most travel agencies expanded operations in that there was no payment of royalties and the travel agency was independently owned and operated. *TravelBank offered the opportunity to own a travel business operating at lower overhead. *TravelBank would provide increased revenues in other areas. *New advances in ticket printing technology along with Airlines Reporting Corporation (ARC) regulations permitted the placing of ticket printers in corporate accounts, allowing the dealership to compete for large local, regional or national accounts by giving clients their own ticketing. *The "reservation center" would automatically add such tickets to the dealership's weekly report and the dealer would receive full commission for the account. *The reservation center would provide expanded service without having to hire "full-time expensive" employees. *The only cost to the dealership in this regard would be a small fee per ticket issued which fees were designed to cost less than hired staff especially in a situation of low ticket volume. *Because of TravelBank's new technology, the purchaser could open a full service travel agency and sell all travel products including airline tickets without having to qualify for a bond or put up the cash that a bond required.

After review of the brochure, Profit believed that InterAgency could provide the type of agency he wanted. Before December 13, 1988, Profit met with both Hanner and Misiak. During the first meeting with Hanner, Profit was assured by her that he could get every-

thing he wanted in a travel agency through InterAgency, that Hanner would make sure a full service agency was set up, and that Profit would be getting a whole company behind him rather than just one person. Hanner brought with her a draft of a proposed sales contract which repeated much that had been represented in the mailed brochure. It also stated that InterAgency was an appointed representative of certain regulatory groups including ARC and possessed ticket plates of major national and international airlines.

During negotiations for the purchase, Danco gave an $8,500 check to InterAgency in November to be held in escrow until such time as any sales agreement was finalized. Pursuant to request to return Danco's check, Hanner, expressly on behalf of InterAgency, sent Profit a 30-day post-dated check in the same amount. An accompanying letter from Hanner stated that the check was in exchange for the Danco check of the same amount, "the set-up fee of your networked, full service travel agency"; to return the Danco check "out of hand with the Sales Agreement could cause adjustments and possible risks to obtaining . . . designation in the agreed-upon time frame"; if Danco decided not to proceed with the sales agreement after reviewing it and further conversation, the $8,500 would be refunded with no obligation on either side; the sales agreement would be forthcoming and attached was a list of the major terms to be acted on at that time; the dealership plan was an excellent one for Danco, allowing full profit at lowest cost on the travel arrangements for Danco and others who might be handled; the $8,500 payment was substantially lower than any other means of entering the agency business.

On December 20, Profit notified Hanner in writing that upon review of the final sales agreement it was found "onerous" and not as previously represented in meetings and draft documents; the post-dated check for $8,500 had been received; the amount was to have been escrowed until finalization of the sales agreement and was not to have been used for any purpose until such was accomplished; Danco was cancelling its letter of intent and depositing the post-dated check; and Hanner was to notify her bank to clear the check.

Defendants stopped payment on their check and despite demand did not return Danco's $8,500.

A certificate from the United States Patent and Trademark Office showed that the service mark "TRAVELBANK" had been registered to a major commercial airline in 1986 for a term of 20 years. Documents from the Office of the Georgia Secretary of State reflected that the service mark "Travel Bank" had been registered to another entity in 1984 for a renewable ten-year period.

In its regulatory capacity, ARC acted as a clearinghouse for airline ticketing monies collected and paid. Contrary to the representations in the mailed sales brochure and draft documents, InterAgency

itself did not have a contract with the ARC nor was it authorized to operate under ARC auspices. Only AMCC, a corporation unknown to Danco and which was not a branch of InterAgency, had any affiliation with ARC to obtain ARC accreditation. The type of "full service agency" set-up promised by InterAgency did not meet with ARC rules and regulations.

Danco learned of subsequent similar overtures made by Inter-Agency to other prospective travel agency purchasers. Two of them, Whitten and Austin-Hashimoto, testified at trial. Each had received in the mail brochures and documents making representations which were in substance those made to and relied on by Profit. Influenced by such representations, each entered into purchase contracts for dealerships with InterAgency and paid fees to the company. Neither felt that he or she had received the full service travel agency and services promised by InterAgency.

One of the plaintiff's trial exhibits was a letter from ARC to Hanner informing that AMCC's application for ARC accreditation for Whitten's proposed operation had been disapproved. One express reason for the disapproval was material misrepresentations or inaccuracies in the application which included such as AMCC's representation of the status of the proposed operation as a branch office location rather than the separate legal entity which it was. Another reason was that on May 3, 1988, the State of Georgia had administratively dissolved AMCC due to delinquency in submitting annual reports, the dissolution rendering AMCC's status with ARC, including its ability to submit applications for branch office approval, under review.

1. In enumerations of error three and four, defendants contend the trial court erred in admitting evidence of their transactions with Whitten and Austin-Hashimoto as predicate acts under RICO. They argue inadmissibility because (a) the acts were not set forth either in an original pleading, in a supplementary pleading as provided for in OCGA § 9-11-15 (d), or in the pre-trial order; (b) the acts occurred subsequent to the filing of the action and thus, could not be "predicate" acts; (c) the acts did not demonstrate any injury or harm to plaintiff.

(a) Pleading of acts. Defendants first raised the sufficiency of the pleadings in this regard in their motion for new trial. This is not generally the proper vehicle for contesting the sufficiency of an opponent's pleadings in civil actions. See *Johnson v. Cleveland*, 131 Ga. App. 560, 561 (2) (a) (206 SE2d 704) (1974). When appropriate, civil RICO claims are subject to the procedural requirements of other types of civil cases. See, e.g., *Durham v. Business Mgmt. Assoc.*, 847 F2d 1505 (11th Cir. 1988). By their own admission, defendants did not move for a more definite statement. See OCGA § 9-11-12 (e). Nor did they move for judgment on the pleadings, to dismiss the suit, or

for summary judgment on grounds of insufficiency.

Assuming that defendants are not procedurally barred from now raising the alleged insufficiency, the complaints fail substantively.

Even if the specific transactions with Whitten and Austin-Hashimoto were not outlined in the complaint or pre-trial order, the type of prohibited conduct allegedly involved was. See statement of facts, supra. Plaintiff's pleadings did not fail to state a claim under the state RICO statute. See *State of Ga. v. Shearson Lehman Bros.*, 188 Ga. App. 120, 121 (2) (372 SE2d 276) (1988), following the reasoning in *Caldwell v. State*, 253 Ga. 400 (321 SE2d 704) (1984).

Nor can defendants, contrary to their assertions, successfully claim lack of notice of or opportunity to defend the Whitten and Austin-Hashimoto transactions.

First, both Whitten and Austin-Hashimoto (denominated as Ms. Laura Austin) were named in the consolidated pre-trial order as potential plaintiff's witnesses, giving defendants notice that such individuals were expected to testify. It behooved them to investigate the nature of their testimony. This is especially true inasmuch as they were defending against a RICO claim, which by its very nature often requires proof of dealings with individuals and entities not named as parties to the suit on trial.

Second, any claim of unfair surprise is erased by statements of defendants' own trial counsel. In objecting to Whitten and Austin-Hashimoto's imminent testimony, defense counsel stated, "even though they haven't testified yet, I believe I understand what they are going to testify as to, and I know that everything they will testify as to is improper."

Third, the record discloses that defendants had notice in advance of trial of plaintiff's intention to introduce evidence of defendants' business dealings with these third parties. (1) There is an undisputed post-trial affidavit from plaintiff's counsel which relates circumstances showing that defendants' counsel had full knowledge of testimony by the two witnesses well prior to trial, including that defense counsel argued the inadmissibility of the testimony approximately two months prior to trial during an in-chambers settlement conference. See OCGA § 5-6-41 (f). (2) If such affidavit is disregarded for procedural defect, as defendants now urge, the trial transcript itself reflects defense counsel's pre-trial knowledge. Just prior to the start of trial and during preliminary matters, plaintiff's counsel attempted to raise with the court the issue of the alleged "similar activities." The exchange makes clear that defendants' counsel had engaged in an in-chambers discussion about the issue with the judge handling the case at that time.

(b) Time of acts. First, it should be noted that the Georgia RICO statute allows for the introduction of after conduct as predicate acts

by not imposing the added burden on plaintiff of showing like conduct before the incidents charged as a RICO violation. *Dover*, supra at 432 (1).

Second, contrary to defendants' assertions, plaintiff presented evidence that the transactions with Whitten and Austin-Hashimoto transpired before the filing of this action on July 26, 1989. Austin-Hashimoto testified that she received InterAgency's brochures and documents in April and May of 1989. Her written agreement to purchase a dealership was executed on July 6, 1989. It was admitted as an exhibit without objection. Whitten testified that he received the brochures on which he relied in purchasing the dealership in May 1989 and formulated the deal in discussions with Hanner and Misiak in May and June 1989.

Lastly, even accepting arguendo defendants' premise that at least one of the transactions occurred subsequent to the filing of Danco's suit, evidence of it was not barred merely because it was later in time. The RICO cause of action is based upon a pattern of activity, with the pattern consisting of two or more acts, i.e., predicate acts. By definition, the incident on trial would constitute one of the acts upon which the cause of action is predicated. OCGA §§ 16-14-6 (c); 16-14-4 (a). " 'Pattern of racketeering activity' means engaging in at least two incidents. . . ." OCGA § 16-14-3 (2) [now subsection (8)]. Only one of the third party transactions was needed as the second predicate act. A third similar incident transpiring after filing of the action on trial, even if not qualifying as predicate act, would be admissible as relevant to confirm and amplify the pattern of the alleged racketeering activity and to show its intentional continuation beyond the time the defendants knew of the allegations.

(c) Lack of harm to plaintiff. While it is certain that a plaintiff in a civil RICO suit must show an injury by reason of a violation of OCGA § 16-14-4, see OCGA § 16-14-6 (c), there is no requirement that plaintiff suffer direct harm from each and every alleged predicate act introduced to show a pattern of racketeering activity. The direct involvement with plaintiff is not the interrelatedness or "interconnectedness" required by the Georgia statute. *Dover*, supra at 432 (1); see also, e.g., *Shearson Lehman Bros.*, supra at (2). It is the "pattern" which must be shown, OCGA §§ 16-14-6 (c); 16-14-4 (a); 16-14-3 (2) (now (8)), not that plaintiff was injured by each incident of which the pattern was comprised.

2. In enumerations of error seven and eight, defendants contend the plaintiff failed to proffer evidence of the requisite elements of theft by deception or theft by conversion as an integral part of defendants' alleged RICO activity, so that the trial court erred in allowing the jury to consider the crimes as predicate acts. They assert a complete absence of evidence of conversion and, as to deception, no

evidence that funds were personally obtained and used for anything other than a proper purpose.

(a) Theft by deception. Although the apparent defense at trial was that defendants retained the $8,500 for precontractual services provided to Danco and/or to offset ticket costs incurred by Danco employees, there was ample evidence from which the jury could have concluded that defendants had no legitimate claim to the funds. See statement of facts, supra. Furthermore, even though the $8,500 check was initially to be placed in a corporate trust account, there was substantial evidence that because of defendants' close identity of interest, they each, jointly and severally, directly profited from the funds. Statement of facts, supra; Compare *Robinson v. State*, 198 Ga. App. 431 (401 SE2d 621) (1991).

Theft by deception, OCGA § 16-8-3, is committed when a person "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." Except as to matters having no pecuniary significance and except as to exaggeration by statements unlikely to deceive ordinary persons in the group addressed, a person deceives if he intentionally, "(1) Creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; (2) Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed: . . . (5) Promises performance of services which he does not intend to perform or knows will not be performed." Plaintiff produced evidence which authorized the finding that defendants deceived plaintiff in each of these three ways. Statement of facts, supra. There was evidence of similar conduct with regard to Whitten and Austin-Hashimoto.

(b) Theft by conversion. "A person commits the offense . . . when, having lawfully obtained funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation. This . . . applies whether the application or disposition is to be made from the funds or property of another or from the accused's own funds or property in equivalent amount when the agreement contemplates that the accused may deal with the funds or property of another as his own." OCGA § 16-8-4 (a).

If the jury accepted defendants' assertions that they did not materially misrepresent to Danco their product and services, i.e., the promised travel agency, and thus initially obtained the $8,500 lawfully, plaintiff's evidence authorized the conclusion that defendants later knowingly misapplied the money to their own use. This is also true in regard to the third party instances.

3. In enumerations of error five and six, defendants contend that the trial court erred in admitting purported predicate acts involving mail fraud since there was no evidence that the mailings were made for the purpose of executing a scheme, nor was there any evidence of specific intent and/or contemplated harm on the part of appellants as required by the federal mail fraud statute, 18 USC § 1341. The argument is that in order to constitute mail fraud, the use of the mails must be an integral part of the activity in question and not merely incidental as in this case.

It is unnecessary to address whether or not the evidence justified consideration of mail fraud as a predicate act, because there was evidence of other predicate acts of theft by deception and/or theft by conversion in support of the RICO claim. See Division 2, supra. Even in a criminal RICO prosecution, it is not required that the State prove all predicate offenses alleged; it must only prove two beyond a reasonable doubt. See *Bethune v. State*, 198 Ga. App. 490, 491 (1) (402 SE2d 276) (1991), citing *Brown v. State*, 191 Ga. App. 76, 77 (381 SE2d 101) (1989).

However, assuming without deciding that federal violation of mail fraud is included by reference in the Georgia RICO statute (defendants do not pursue the issue in this appeal), defendants' evidentiary argument fails. See *Dover*, supra, in which consideration of the question of statutory inclusion was waived for failure to raise the issue below. See *Shearson Lehman Bros.*, supra, in which the defendants were alleged to have committed federal mail fraud and in which the alleged crimes including mail fraud were deemed to fall under the list of predicate offenses in the state RICO statute.

The mail fraud statute provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years or both." 18 USC § 1341.

"The elements of the offense of mail fraud under [the statute]

are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. [Cit.]" *Pereira v. United States*, 347 U. S. 1, 8 (74 SC 358, 98 LE 435) (1954).

There was evidence presented by plaintiff that defendants did contemplate and in fact utilize the mails as a primary vehicle for distributing the publications which contained inaccurate representations to promote the sales of the travel dealerships.

4. Contrary to defendants' enumerations of error one, two, and eleven, and for the reasons outlined in Divisions 1, 2, and 3, supra, the trial court did not err in refusing to grant defendants directed verdicts, judgments notwithstanding the verdicts, or a new trial based on the alleged failure of plaintiff to prove its RICO claim.

5. In enumeration of error nine, defendants contend the court erred in giving instruction to the jury concerning what they here denominate as the "collectibility of the judgment." Defendants complain that certain statements were unresponsive and prejudicial by implying that a verdict in plaintiff's favor would be proper and by unnecessarily focusing the jury's attention on the question of collectibility of a judgment from a particular defendant rather than continuing to focus the jury on the merits of the case and the question of liability of each of the defendants, if any.

After beginning deliberations, the jury asked the court: "If we find against the defendants, is there a separate amount awarded against each or is the amount inclusive for all three or any of the three?" (The verdict form provided three separate choices for each of the three defendants.) The court read the question to the parties' attorneys and received the views of both counsel, which were essentially in agreement. Plaintiff's counsel recommended a re-charge on joint and several liability because the defendants could be found to have differing liabilities. Defendants' counsel merely reiterated that each defendant was separate and could have differing liability or none.

The jury was returned to the courtroom and instructed that there was a separate verdict form for each defendant; the verdict as to each defendant should be for that defendant without regard to the other two defendants necessarily; the jury could find for one and not for the other two; the jury could find for one on one count and another one on a different count and not for the third; if a finding was made against one of the defendants, then damages were to be awarded according to the court's instruction; there had to be a separate finding of liability, if any, as to each defendant.

The jury asked the follow-up question: "If for example, then we find that all three defendants are guilty, does that mean that, for example, on the RICO statutes if we were to find that, that it would be

$36,000 three times or would that be an inclusive figure for all three defendants if we were to find that?"

The court responded to the hypothetical by stating that the jury was to calculate the liability for each defendant and that the jury was not to divide the amount of liability among defendants. To explain what such a verdict would mean so that the jury would be able to express its intention, the court then stated the following to which defendants object: "In collection, it can only be collected once but it is a joint and several liability if you find them liable under the same count. Now, if you found two defendants liable under different counts, you can find that also." The jury interposed: "But the most then that conceivably can be paid for everything would be that $36,000 figure." The court answered with the further objected-to statement: "The plaintiff could not — the plaintiff gets only one collection but he gets to choose who he collects from if the same award is made against more than one defendant." This colloquy apparently satisfied the jury's understanding, as no further questions were asked.

Defense counsel did not clearly articulate at trial the complaint made here, which complaint is set out in the first paragraph of this division. Counsel asked that the court tell the jury to disregard the instruction "about the collection procedures which is not in evidence" because it was "lethal" and "highly destructive" to defendants.

Defendants' objection was arguably inadequate to preserve the complaints now made, for failing to provide the trial court with any legal basis so that the court could make an informed ruling. See *F.A.F. Motor Cars v. Childers*, 181 Ga. App. 821, 822 (2) (354 SE2d 6) (1987), applying the test in *Christiansen v. Robertson*, 237 Ga. 711 (229 SE2d 472) (1976).

Assuming the objection preserved the present complaints, they are meritless. The focus was necessarily on the permissible amount and allocation of an award, since that was the jury's concern. The jury was grappling with the legal concept of joint and several liability. It sought enlightenment on the meaning of the verdict in this regard. The court was obligated to explain, and the explanation it gave was not faulty. The court simply conveyed to the jury the effect which the application of joint and several liability would have on their 9-options verdict.

It was the jury, not the court, which prompted focus on the subject of damages, and that fact, especially when considered together with the entire charge, does not support an implication that the court indicated that the judgment should be in favor of plaintiff. The instruction did not encourage the jury to return a verdict for an inflated amount of damages.

Even if it could have resulted in a verdict which was based on the jury's opinion as to the financial wherewithal of one or less than all of

appellants to pay a judgment rather than upon each appellant's own individual liability, it obviously did not, since a joint and several verdict was returned against all appellants. "It is axiomatic that to authorize reversal of a judgment there must be shown not only error ([cit.]), but *harmful* error, and the burden is upon the one claiming error to prove it. [Cit.] [Appellants have] not done so here, so the . . . charge . . . cannot be cause for reversal. [Cit.]" *Plyler v. Smith* 193 Ga. App. 114 (1) (386 SE2d 881) (1989).

6. Contrary to defendants' contentions in enumerations of error ten and twelve and for the reasons outlined in Divisions 1 through 4, inclusive, the trial court did not err in entering the judgment of treble damages for plaintiff.

## Case No. A91A1682

Plaintiff contends the trial court erred in holding that its trial counsel's statement to the jury regarding the amount of attorney fees and other expenses of litigation incurred by plaintiff was insufficient to support the jury's award in this regard, thereby conditionally granting defendants' motion for new trial.

The threshold question is jurisdiction. Can the plaintiff cross-appeal its accepted remittitur of attorney fees?

The answer appears in *Sparks v. Aetna Ins. Co.*, 62 Ga. 198 (1879): "Where a new trial is awarded, unless the plaintiff shall write off a part of the recovery, and the plaintiff voluntarily does so, reserving, however, the right to a bill of exceptions to this court, such voluntary act on the part of the plaintiff will estop her from complaining about that which she did at her own election. She must either refuse to write off part of the verdict, and bring the whole case here for review, or acquiesce in the judgment and take what that judgment accords her." As in the instant case, *Sparks* was a cross-appeal. See *Aetna Ins. Co. v. Sparks*, 62 Ga. 187 (1879).

The Court summarized the *Sparks* ruling in *Central of Ga. R. Co. v. Perkerson*, 112 Ga. 923, 940 (4) (38 SE 365) (1901): "This court held that the plaintiff could not except to a judgment with which she had voluntarily complied." The same principle was applied in *Anderson v. Sapp*, 135 Ga. 204, 205 (2) (69 SE 181) (1910), which also involved a cross-appeal: "Where a successful litigant voluntarily writes off a part of his recovery, he can not complain of the action of the court in requiring him to reduce his verdict as a condition of refusing a new trial."

Thus Georgia retains the general rule at common law, that a plaintiff cannot accept a remittitur and then appeal the entry of the lesser judgment. Many jurisdictions have modified this to allow a plaintiff to accept the lesser in the interest of ending the dispute and

the case without forfeiting the right to cross-appeal the issue of defendant's entitlement to the reduction in the event the defendant appeals. See 16 ALR3d 1327-1337 and the annotations therein. Such would also serve judicial economy because if defendant chooses to accept the lesser judgment agreed upon by plaintiff rather than appeal the denial of the motion for new trial, the case is at an end. A second trial, which might result if the denied motion is appealed and reversed, would be avoided.

The reasoning is well stated in *Plesko v. Milwaukee*, 19 Wis.2d 210 (7) (120 NW2d 130, 137 [7,8]) (1963): "The objective underlying the . . . procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the [modified] rule . . . may to some extent discourage appeals by the party held liable because the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated."

The law in Georgia being otherwise, the cross-appeal is affirmed.

*Judgment in Case No. A91A1681 for treble damages affirmed. Judgment in Case No. A91A1682 of remittitur of attorney fees affirmed. Johnson, J., concurs. Carley, P. J., concurs in the judgment only.*

DECIDED MARCH 18, 1992.

*Gambrell, Clarke, Anderson & Stolz, Robert D. Feagin, John K. Saunders,* for appellants.

*John S. Parker, Kilpatrick & Cody, Matthew H. Patton,* for appellee.