**SOUTHERN INTERMODAL LOGISTICS, INC., Plaintiff,**

v.

**D.J. POWERS COMPANY, INC., The Yang Ming Line, and Solar International Shipping Agency Inc., Defendants.**

No. CV 496–209.

United States District Court, S.D. Georgia, Savannah Division.

March 18, 1998.

Walter Charlton Hartridge, II, D. Michael Conner, Edgar Pomeroy Williams, Carlton Edward Joyce, Bouhan, Williams & Levy, Savannah, GA, M. Brice Ladson, John Gregory Odom, Ladson & Suthers L.L.P., Savannah, GA, for. Southern Intermodal Logistics.

Inman Gregory Hodges, Patricia Tanzer Paul, Oliver, Maner & Gray, Savannah, GA, Kim T. Stephens, Blasingame, Burch, Garrard & Bryant, Athens, GA, Edward Donald Tolley, Cook, Noell, Tolley & Aldridge, Athens, GA, Edward M. Joffe, Sandler, Travis & Rosenberg, Miami, FL, for D.J. Powers Co., Inc.

Robert Edward Spears, Jr., Hunter, Maclean, Exley & Dunn, Savannah, GA, for Rob Spears.

Robert Strudwick Glenn, Jr., Hunter, Maclean, Exley & Dunn, Savannah, GA, for The Yang Ming Line, Solar International Shipping Agency, Inc.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Plaintiff Southern Intermodal Logistics, Inc. ("SIL"), an interstate motor carrier, brought this Georgia RICO-based action against several defendants for conspiring to extort from SIL illegal kickbacks to defendant D.J. Powers Company, Inc. ("Powers"). SIL contends that Powers and its co-conspirators wanted it to pay Powers the kickback for each container of cargo that SIL hauled from an ocean freight port of entry ("POE") to a K–Mart Corporation inland distribution center.

Because this case is fact-heavy and compels a rigorous examination of Georgia RICO law, the Court will first illuminate the cast of characters. During all relevant times, Powers served as K–Mart Corporation's customs house broker. Defendant The Yang Ming Line ("YM") is a foreign steamship line that carried K–Mart Corporation's ("K–Mart's") ocean freight to POEs. Defendant Solar International Shipping Agency, Inc. ("Solar") was YM's U.S. general agent in charge of YM's U.S. business, including solicitation business and delivery of import cargo. Solar, in turn, executed its duties for YM in Savannah, Georgia and Wilmington, North Carolina through the Carolina Shipping Company ("Carolina"), an independent steamship agent.

Defendants Powers, YM, and Solar now move for summary judgment. SIL opposes the motions, contending that fact issues preclude summary judgment. This Court applies the summary judgment principles explained in *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir.1996) and *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996).

## II. BACKGROUND

### A. "It Started Out So Simple"

SIL began doing business with YM around 1986 or 1987, Hogan dep. vol. I at 286,[1] and later became a YM "house carrier."[2] Hosey Aff. ¶4 (doc. #187 Exh. F). During 1990 and 1991, SIL handled between 85% to 100% of YM's freight, see id.; McNair Aff. ¶8 (doc. 187 Exh. E), and serviced YM's K–Mart account. Id.

K–Mart operated a main international distribution center in Savannah until 1991. Carter 2/25/97 dep. at 121. In March of that year, K–Mart opened a new international distribution center in Ocala, Florida, Abraham Aff. ¶5 (doc. #187 Exh. U), and maintained yet another distribution center in Newnan, Georgia. Carter 7/25/97 dep. at 121. SIL hauled containers first from Savannah to Newnan and later to Newnan and Ocala. Abraham Aff. ¶5; Hosey Aff. ¶4; McNair Aff. ¶8. SIL and YM, however, never expressly agreed to any particular level of hauling volume. Hogan dep. vol. I at 137–39, 289.

Although Powers had already been brokering overland freight transportation, it decided to augment this area of its business by forming what it called a "Domestic Transportation Department" ("DTD") in 1990. Carter 7/24/97 dep. at 25. It hired Marsha Herb to serve as its DTD director. Herb dep. at 19. The DTD signed SIL up as a motor carrier in 1990 under Powers' "Interstate Contract for Trucking Services" (hereafter, "Interstate Contract"). Doc. #187 Exh. 42.

Significantly, while SIL and Powers had engaged in past dealings (i.e., in 1988), see doc. #145 at 18 n.30; #190 at 49, Powers was *not* involved in putting SIL together with YM. Doc. #190 at 49–51 (undisputed). And, when SIL entered into the 1990 SIL/Powers Interstate Contract, SIL was already hauling freight for YM.

In any event, what the Interstate Contract stated and what the parties actually intended

to do is not in complete alignment. For example, the Interstate Contract obligated SIL to transport goods provided by Powers at a scheduled rate, doc. #187 Exh. 42 ¶1, and also pay Powers an "administrative fee" to offset the cost associated with generating bills of lading. Id., last attachment. Yet, Powers has never claimed that as the fee's purpose because Powers has never prepared any bills of lading. Herb insists that the fee was intended to cover the cost of "overhead of having clerical and admin people" and "basic day-to-day operations." Herb dep. at 37. On top of all that, the record remains unclear whether Powers actually brokered any new hauling business for SIL under the Interstate Contract.

### B. "A Commission Request"

SIL points to that background in focusing the Court's attention on a March or April, 1991 telephone call from Herb to Hogan, during which she asked him to voluntarily relinquish the K–Mart account. He refused. Hogan dep. vol. I at 141–42. Herb then called back a day or two later and, on behalf of Powers, requested that SIL pay it a commission.[3] Id. at 142. She claimed that Powers was "in a position" to request it from SIL, though she did not cite to the contract's "administrative fee" provision, or any other legal basis to support that contention. Id.

Hogan refused Herb's "request" since SIL, after all, was already hauling K–Mart's freight for YM as YM's house trucker. Id. Powers thus had done nothing to justify the commission Herb now requested. In fact, Hogan concluded that any commission would be illegal. Id. at 143. When he pointed this out to Herb, she implied that Powers would influence K–Mart into pressuring YM to stop using SIL. Id.; Hogan dep. vol. II at 39–40.

---

1. Although there is more than one Hogan involved in this case, all "Hogan dep." cites reference Peter Hogan's testimony unless otherwise indicated.

2. A "house carrier" or "house trucker" enjoys an "interchange agreement" with YM at competitive rates. Collins dep. at 113; Chou dep. at 30.

3. Again, and notwithstanding what the Interstate Contract stated, SIL had not been paying Powers any commissions or "administrative fees" for the K–Mart/YM containers that it had been hauling, since Powers had not procured the K–Mart business for SIL.

## C. "Aggressive Marketing Tactics"

Clearly no pushover, Hogan contacted both Mike Collins (Carolina) and Lloyd Seow (Solar) to report Herb's actions. Hogan dep. vol. I at 146. He specifically informed Seow that he considered both the commission and Herb's threats to be illegal. *Id.* at 149. Seow responded that Hogan should ignore Herb because it was Solar—not Powers—who routed the freight, and SIL was doing a good job.[4] *Id.* Collins also told Hogan not to worry about Herb's calls. *Id.* at 150.

But Hogan did not stop worrying. He next contacted Robert Frederick, Northeast Intermodal Director of Transportation for "Senator Line,"[5] another ocean carrier that transported containers for K–Mart and used SIL for that purpose. Hogan asked Frederick whether Herb had approached him about terminating its use of SIL for Senator Line's K–Mart freight. *Id.* at 150; Frederick Aff. ¶ 4 (doc. # 187 Exh. K). Frederick responded "no" but agreed to inform Hogan if she did. *Id.*

Hogan met with Herb in April or May, 1991. At that time, she repeated her commission request, and he repeated his conten-tion as to its illegality. Hogan dep. vol. I at 159.[6] Sometime after that meeting, Hogan called Seow (Solar) again. This time Seow disclosed that Herb had called Solar. Hogan dep. vol. II at 41. Likewise, Hogan also called Collins (Carolina) about Herb's continuing threats and demands. Hogan dep. vol. I at 286. According to Hogan, Collins conceded that Herb had been pressuring YM in New York about SIL. Hogan dep. vol. II at 42.

Succumbing to Herb's pressure, Collins told Hogan that SIL should just pay Powers the commission because "we don't need any trouble and (Herb's) a pain in the neck and she's going to cause all kinds of trouble. And she's got power with K–Mart and we've got to work this out." Hogan dep. vol. I at 285.[7]

Daniel Mitchell (SIL's Vice President) recalls a meeting in early to mid May of 1991 between himself, Hogan, and Collins. There Collins again urged SIL to "go along" with the commission because otherwise YM "was concerned" that it might lose the K–Mart business.[8] Mitchell Aff. ¶ 8 (doc. # 187 Exh. S). Specifically, Collins was "concerned"

4. Seow recalls discussing this matter with Hogan but cannot remember when the conversation took place. Seow dep. at 71–74.

5. The parties have been inconsistent in their spelling of "Senator Line." *See e.g.,* doc. # 150 at 35 ("Senator Lines"); # 187 Exh. K ("Senator Linie"); # 190 at 19 (using both "Senator Line" and "Senator Linie"). For consistency only, the Court will use "Senator Line" here.

6. Hogan was not the only one objecting to Herb's demands. Daniel Mitchell, SIL's then Vice–President, conversed with Herb in April, 1991 about her demand for a commission. SIL's rates, he stressed, simply left no room for the commission that Powers was demanding. Mitchell Aff. ¶ 7 (doc. # 187 Exh. S).

Mitchell also explained to Herb that SIL was YM's house carrier and was carrying the K–Mart freight before the DTD was even established. Herb replied that "K–Mart was Powers' customer, and that K–Mart controlled the routing, not [YM], and that K–Mart could change steamship lines if necessary." *Id.* Hence, Herb again implied that she would influence K–Mart against SIL.

7. In his testimony, Collins did not explicitly agree that this occurred. He conceded, howev-er, that he spoke with Hogan at this time. He avers that he cannot recall the conversation's content except that Hogan did not want SIL to lose K–Mart's business. Collins dep. at 102–05.

Hence, Hogan's testimony again stands unrebutted, and this fact (i.e., that Collins urged Hogan to "just pay Powers" in light of Herb's pressure tactics) is now established. *Cf., Southern Intermodal Logistics, Inc. v. Smith & Kelly Co.,* 190 Ga.App. 584, 587, 379 S.E.2d 612 (1989) (because party opposing summary judgment "introduced only vague and equivocal testimony, and ... produced no evidence conflicting with the positive and direct testimony offered by [the moving party]," the moving party is entitled to judgment as a matter of law).

8. As far as this litigation is concerned, YM and Solar functioned as essentially the same entity; Solar handled all of YM's business in the U.S. because YM had no employees in the U.S. Collins dep. at 11. Accordingly, the parties often use the two names interchangeably—further complicating an already tedious story.

that Powers could influence K–Mart to use a different ocean carrier than YM. *Id.*

### D. "A Marketing Letter"

In conjunction with her initial call to Hogan, Herb and other Powers employees began soliciting businesses, including K–Mart, for the domestic motor vehicle operations to be conducted by Powers' DTD. Herb dep. at 77–80; K. Peterson dep. at 34. To that end, Kay Peterson, another Powers employee, made several telephone calls to K–Mart's Linda (no relation) Peterson and Shirley Pinkett to explain Powers' DTD. K. Peterson dep. at 33–37. Powers also sent Linda Peterson, who was K–Mart's transportation chief, a follow-up solicitation letter advertising its DTD services. Doc. # 187 Exh. 99.

That letter came from Richard Carter, Powers' President, and it requested that Peterson sign an attached letter endorsing Powers' DTD program so Powers could then send it on to K–Mart's ocean carriers. *Id.* The letter would be quite useful to Powers; while it did not obligate K–Mart to use Powers' designated trucking companies, nevertheless Powers would be able to use it to "inform" ocean carriers that K–Mart had asked Powers to perform all of its tracking and tracing services. *Id.* In that way, Powers could use the letter to induce the carriers to "cooperate" with it. *Id.* Powers therefore would be in a position to influence which trucking haulers the carriers should use.

Evidently recognizing no upside for itself, K–Mart decided not to get involved with Powers' DTD program. L. Peterson dep. at

86. So, Peterson declined to sign the letter. *Id.*

### E. Weaving the Web
#### (1) Getting Carolina Onboard

Sometime in the spring of 1991, Powers approached Carolina [9] about the "third-party logistics" [10] Powers' DTD could provide to YM in connection with the transportation of shipping containers to distribution centers. Collins dep. at 87–99. Although it is unclear whether K–Mart or YM/Solar/Carolina made the decision, nevertheless the parties struck a deal. *See* Carter 7/25/97 dep. at 82–83, 92. Powers would now handle Carolina's K–Mart business. The record is unclear as to why this decision was made.

Subsequently, Collins (Carolina), along with another, unidentified YM/Solar employee, met with Powers representatives Carter, Herb, and Kay Peterson on 5/15/91 to coordinate their business procedures so that Powers' carriers could begin hauling K–Mart containers. [11] Carter 7/25/97 dep. at 87–89, 91; Collins dep. at 88, 92. [12]

Once in place, Powers fully exploited its new ability to recommend which carriers Carolina should use. It promptly replaced SIL with American Trans–Freight ("ATF"), which began hauling K–Mart containers for YM sometime around 5/15/91. Herb dep. at 106–07; doc. # 187 Exh. 27 at 2. Given the sheer density of SIL's business volume, it took some time before Hogan noticed the change. Hogan dep. vol. I at 139–40, 190.

#### (2) Getting K–Mart Onboard

On 5/30/91 Carter, Herb, Kay Peterson, and possibly Lindsey Waters—all Powers

---

9. Again, Solar executed its duties for YM in Savannah, Georgia and Wilmington, North Carolina through the Carolina Shipping Company ("Carolina"), an independent steamship agent.

10. "Third-party logistics," according to Collins, means dealing with problems that arise when multiple motor and ocean carriers transport K–Mart freight to K–Mart distribution centers. Collins dep. at 94.

11. Jerry McNair, a former Carolina employee, recalls a mid-May, 1991 meeting at Carolina's office with Herb, Collins, and others to discuss the procedures for handling K–Mart cargo.

McNair Aff. ¶ 11 (doc. # 187 Exh. E). Herb, McNair recalls, requested that American Trans–Freight replace SIL and Collins agreed, but he did not mention when this occurred. *Id.* ¶ 12. According to McNair, Carolina would not have changed trucking companies for the K–Mart account without first consulting YM, as that was Carolina's standard practice. *Id.* at ¶ 13.

12. Collins does not remember much about the meeting, except that it took place at Carter's office. *Id.* at 92.

personnel—met with Linda Peterson and other K–Mart personnel. Carter 7/25/97 dep. at 78–82; Herb dep. at 77–80, 93; L. Peterson dep. at 87. Although the primary purpose of the meeting was for K–Mart to inform Powers about a merger of two K–Mart corporations, Carter 7/25/97 dep. at 80, Powers again explained its transportation program. *Id.* at 78; Herb dep. at 91–93. According to Herb, Powers "probably" informed K–Mart's representative about the administrative fee at that time, Herb dep. at 92–93, though neither Carter nor Linda Peterson could recall mention of it. Carter 7/25/97 dep. at 96–97; L. Peterson dep. at 88.

For that matter, the parties have submitted only vague testimony as to whether K–Mart sanctioned Carolina's emplacement of Powers in the motor-carrier selection driver's seat. Carter claims he cannot recall either way on this point,[13] but notes that Powers' designated motor carrier, ATF, began hauling K–Mart containers around 5/20/91. Carter 7/25/97 dep. at 82–85.

#### (3) Getting Senator Line Onboard

In mid-July Frederick (Senator Line) informed Hogan that Herb had been trying to persuade Senator Line to replace SIL with another motor carrier for its K–Mart containers. Frederick Aff. ¶ 6 (doc. # 187 Exh. K); Hogan dep. vol. I at 166–67.

#### F. SIL Fights Back

Around the same time as Frederick's telephone call, Hogan wrote John Chou, a manager in Solar's New York office, a letter about Powers' actions.[14] Hogan dep. at 167–68. Hogan's 7/22/91–dated letter warned of Powers' plan to systematically replace SIL with other truckers willing to pay Powers its administrative fee (i.e., commissions) by using pretextual reasons (e.g., "poor service").[15] Doc. # 145 Exh. 6.

For reasons not made clear by the record, SIL resumed carrying K–Mart containers for YM in August, 1991.[16] Citing no evidence, Powers insists that SIL regained that business because of its "defamatory attack on Powers through a letter writing campaign, etc." Doc. # 145 at 8. Carter (Powers) supposed that Powers lost that business to SIL as a result of Hogan's letter to YM, though no one from YM called Powers concerning that change.[17] Carter 7/25/97 dep. at 157–58.

#### G. K–Mart Weighs In

On 12/17/91, Peterson and Pinkett of K–Mart sent YM a fax requesting that it discontinue using SIL for K–Mart freight because SIL's service had "declined tremendously." Doc. # 187 Exh. 5.[18] In Hogan's eyes, Herb had struck again. Hogan dep. vol. I at 190–93, 198.

Some of the players involved at this juncture, however, have claimed "difficulty" recollecting the events surrounding this fax. K–Mart's Peterson, for example, does not recall receiving any complaints about any out of the

---

**13.** SIL argues that it would have been impossible for K–Mart to give Powers the right to select the motor carriers to handle the YM/K–Mart freight because YM retained the right to select the carrier under its contract with K–Mart. Doc. # 190 at 10 (citing L. Peterson dep. at 48).

**14.** Hogan "cc'd" Seow (Solar) and Collins (Carolina). Doc. # 145 Exh. 6. Collins remembers Hogan's letter, but Chou and Seow do not. Collins dep. *at 108–109; Chou dep. at 44; Seow dep.* at 74.

**15.** At the time Hogan wrote this letter, he had not yet realized that SIL had already lost the YM/Solar/Carolina-generated, K–Mart freight business in May of 1991. Hogan dep. vol. I at 165.

**16.** While the documentation SIL cites is unclear, *see* doc. # 190 at 30, Powers does not dispute this fact. *See, e.g.,* doc. # 145 at 8.

**17.** Herb did not remember that Powers had lost the YM/K–Mart freight for several months in 1991. Herb dep. at 163–64.

**18.** The body of the fax states, in its entirety:

To advise you and your counterparts to discontinue the use of SIL trucking for any/all of deliveries to KMART warehouse. Their service has not improve [sic], in fact it has declined tremendously. Please advise [SIL's] president that Linda [Peterson] does not wish to receive any calls from him or his office. Thanking you in advance for your co-operation.

Please advise this office for the name of trucker that will replace SIL trucking.

ordinary service problems with SIL. L. Peterson dep. at 79–80. And, no one from Powers or YM forwarded any SIL-service complaints to her. *Id.* at 105–06, 122, 124. Peterson claims that she relied upon Pinkett for the information about the service problems indicated in the fax. *Id.* at 114–15. But Pinkett, too, has no recollection of the statements made in the fax. Pinkett dep. at 46. Not surprisingly, SIL smells a rat here. *See* doc. # 190 at 31–32.

For that matter, none of Carolina's employees could recall any service problems with SIL. *See* Hosey Aff. ¶ 5 (doc. # 187 Exh. F) ("SIL handled the freight smoothly and on a timely basis"); *see also id.* (such complaints would have been initially reported to her); *see also* McNair Aff. ¶ 9 (doc. # 187 Exh. E) (Hosey's supervisor averring that "[t]here were no serious or out of the ordinary complaints by K–Mart or other parties about SIL's service during 1990 or 1991, as I would have handled any such complaints on a daily basis in the office"); Collins dep. at 60, 66 (Collins likewise could not recall any SIL service problems, nor having written any telexes or faxes on the subject).[19]

At this point the parties intensify their focus as to what "truly" motivated K–Mart, and thus whether and why there were any SIL service-based complaints. These facts greatly figure into SIL's RICO-conspiracy claims. Boiled down, SIL essentially alleges that Powers, YM, and Solar conspired to further Herb's (hence, Powers') extortion tactics by convincing K–Mart to agree that SIL should be replaced with another motor carrier. *See* doc. # 190 at 64.

Hence, the "service complaint" evidence rises in importance. The defendants seek to show that SIL legitimately lost business (from giving K–Mart poor service), while SIL maintains that such is all pretext to cover defendants' tracks. It is in this light that the Court now turns to the remaining "poor service" evidence.

### (1) The Barbro Fax

Defendants YM and Solar direct the Court's attention to something that occurred some two months prior to the K–Mart fax. They point to a 10/16/91–dated telex from Paul Barbro, general manager of Carolina's Atlanta office, to Seow in Solar's New York office. Doc. # 150 at 10. Barbro's fax indicates that he had received a telephone call from an "irate" Joe Watkins, who managed a K–Mart warehouse facility in College Park, Georgia. Doc. # 150 Exh. I. After not returning Hogan's calls, Watkins had received an "abrupt" message from Hogan. When he returned Hogan's call, Hogan complained that K–Mart was "not giving .S.I.L. a chance." [20] *Id.* The fax, however, does not mention any specific service problems, but simply states: "I was also told that Newnan and Ocala are having problems with S.I.L. which seems to be different thatn [sic] what you wee [sic] told." *Id.* Collins (Carolina) states that this is the only document that he is aware of that discusses any service problems with SIL. Collins dep. at 160.

### (2) Solar's Knowledge

Both Seow and Chou (Solar) testified that they were not aware of any complaints about SIL's service. Seow dep. at 62–63; Chou dep. at 61. Chou did indicate, however, that after he changed departments in May of 1991, he was no longer in a position to have heard about complaints. Chou dep. at 61–62.

Chris Wimberly, another Solar employee, testified that he received a call from Pinkett (K–Mart) in the fall of 1991. Wimberly dep. at 30–37. At that time, she complained about problems with SIL's deliveries to the Ocala and Newnan distribution centers, specifically with respect to a delay in picking up empty containers and sometimes in delivering them. *Id.* at 31–33.

Pinkett, on the other hand, does not recall any conversation but admits that it could

---

19. Collins (Carolina) stressed that any large volume cargo carrier like SIL is bound to incur some service-based complaints. Collins dep. at 51–53.

20. YM and Solar place an unsupported spin on what this fax relates. *See* doc. # 150 at 10 (implying that Watkins complained that Hogan was being rude to his staff and harassing him).

have happened. Pinkett dep. at 19–20. Wimberly's testimony of a call from Pinkett about problems with SIL must be viewed in light of the testimony of Phillip Abraham, K–Mart's freight traffic manager at its Ocala distribution center in 1991.

Abraham unequivocally stated that there were no problems with SIL's service. Abraham Aff. ¶6 (doc. # 187 Exh. U). In fact, years later he recounted (in an 8/7/95 letter) the praiseworthy service SIL had provided from 1991–94.[21] Doc. # 187 Exh. 2. He cannot understand why Peterson and Pinkett (K–Mart) sent the 12/17/91 fax because SIL's service had simply not declined.[22] Abraham Aff. ¶11. Hence, there is at best scant evidence that SIL's service had in fact declined by the time K–Mart sent its 12/17/91 fax.

### (3) "Threatening Phone Calls?"

Defendants next maintain that K–Mart directed YM to stop using SIL because Hogan made threatening telephone calls to Linda Peterson. Doc. # 145 at 9; # 150 at 11. Peterson, however, made no such claim in her deposition, and the fax did not express that assertion. *See* doc. # 187 Exh. 5. Instead, it merely commented on SIL's allegedly declining service and advised YM that Linda Peterson did not wish to receive any calls from SIL's president. *Id.; see supra* note 17.

On the other hand, Peterson did testify that either on the day of or just before the fax an irate individual representing himself as "Peter Hogan" called her. L. Peterson dep. at 62–66, 116. The individual was upset that SIL had lost its K–Mart freight business. *Id.* Hogan, for that matter, denies that he ever made any calls to Peterson between August and December of 1991. Hogan dep. vol. I at 182–83.

### H. The Ax Falls

After Solar received the 12/17/91 K–Mart fax, Carolina stopped placing K–Mart container hauling business with SIL. *See* doc. # 150 at 11 (undisputed). Although Solar had the right under its service contract with K–Mart to designate its house trucker to haul loads to the K–Mart distribution centers, it normally honored the requests of a significant customer as to which trucking company to use. Collins dep. at 112–13.

SIL argues that the factual assertions in the 12/17/91 fax are incorrect and that the origin of the fax can be traced to Herb. Doc. # 190 at 31. It points to Pinkett's testimony that if K–Mart really did not want SIL to handle any of its freight because it was such a bad carrier, then K–Mart would have sent a fax to all of its ocean carriers using SIL, and not just YM. Pinkett dep. at 52. SIL also maintains that it had a good service record with K–Mart and YM. Given the fact that defendants cannot point to any evidence that SIL's service was in fact declining as the 12/17/91 K–Mart fax indicated, sufficient evidence exists to authorize a jury to find, at a minimum, that suspicious circumstances surround that fax.

### I. K–Mart Reacts to Powers' Administrative Fee

In February of 1992, K–Mart Corporation and K–Mart Apparel Corporation merged, and K–Mart formed a new "International Transportation Department" headed by F. Becton Uhrbrock. Uhrbrock Aff. ¶¶3, 5 (doc. # 187 Exh. H). In mid-1992 David Fleming, Distribution Center Coordinator for K–Mart's International Transportation Department, received complaints from one or more motor carriers hauling cargo into K–

---

**21.** Abraham also testified that, shortly before her own deposition, Herb called him and urged him to disavow the complimentary statements that he made about SIL in that letter. *Id* . ¶17.

**22.** According to Abraham, Herb had repeatedly tried to convince him that ATF should be handling K–Mart's cargo. Abraham Aff. ¶8. In her phone calls to him, Herb criticized SIL as a poor

carrier and, Abraham maintains, unfairly blamed it for many of the distribution centers' problems. *Id.*

In addition, Abraham was surprised by Pinkett's complaints about SIL because a large volume of the K–Mart cargo transported through Savannah went to the Ocala distribution center, which reported no problems with SIL. *Id.* ¶9.

Mart distribution centers. Fleming Aff. ¶¶ 3, 4, 9 (doc. # 187 Exh. I). The carriers complained about having to pay Powers its administrative fee. *Id.* at * ¶ 9.

. In response, Uhrbrock, Fleming, Linda Peterson, Pinkett, and Vincent Marchesani [23] met to discuss the administrative fee. They agreed that Powers should immediately discontinue it. *Id.* ¶ 10; Uhrbrock Aff. ¶ 11; Marchesani Aff. 2nd ¶ 5. More specifically, they viewed the fee as improper because K–Mart, its ocean carriers, and its motor carriers were already performing the container tracking function that Powers alleged to be performing for K–Mart.[24] Uhrbrock Aff. ¶ 12; Fleming Aff. ¶ 10; Marchesani Aff. 2nd ¶ 5.

So, Uhrbrock wrote Herb a 7/2/92 letter and informed her that there was "no excuse for charging [each] trucker a $15.00 fee." Doc. # 187 Exh. 81. Nor should Powers charge any fees represented as a K–Mart fee. *Id.* Fleming called Herb later that month and she agreed to send letters to all of its DTD carriers indicating that K–Mart did not sanction Powers' administrative fee. Fleming Aff. ¶ 11.

Fleming never received any verification that such letters were sent to Powers' carriers as he directed. *Id.* Carter (Powers) recalls seeing Uhrbrock's 7/2/92 letter and believes that Herb "probably" sent letters to Powers' carriers. Carter 7/24/91 dep. at 103–05. He was unable, however, to cite to any documentary proof that the letters in fact were sent.[25]

In March of 1993, Fleming (K–Mart) sent K–Mart's ocean carriers a new "pier drayman" list [26] that named U.S. Intermodal [27] as pier drayman for the Ocala and Newnan distribution centers.[28] U.S. Intermodal, however, did not carry any K–Mart containers for YM until mid–1994. Abraham Aff. ¶ 16 (doc. # 187 Exh. U). The record is unclear as to the reason for this delay.

## III. ANALYSIS

### A. Standard of Proof

■ To survive summary judgment, SIL must present enough evidence to convince a jury that the defendants committed a RICO violation. The issue is complicated by the Georgia RICO Act's failure to specify the standard of proof needed to show a civil RICO action. *See* O.C.G.A. § 16–14–1 et seq. Defendants argue that *Simpson Consulting, Inc. v. Barclays Bank PLC*, 227 Ga.App. 648, 490 S.E.2d 184 (1997), the only Georgia case to address this issue, answers the question: clear and convincing evidence. Doc. # 150 at 12–13; # 145 at 11.

23. Marchesani was Operations Manager in K–Mart's new International Transportation Department. Marchesani Aff. ¶ 3 (doc. 187 Exh. J).

24. Uhrbrock and Fleming went farther than that and deemed Powers' fee an unethical business practice. ·Uhrbrock Aff. ¶ 12; Fleming Aff. ¶ 10. Uhrbrock and Marchesani were concerned that the fees might be illegal. Uhrbrock Aff. ¶ 13; Marchesani Aff. ¶ 6.

25. Powers produced a letter, retrieved from Herb's computer and addressed to David Slack of Wyatt Transfer, Inc., which reminded him that his company could cancel its contract with Powers' DTD upon 30 days notice. Doc. # 187 Exh. 85. Powers believes Herb sent this same letter to several carriers and simply substituted the addressee. Carter dep. at 105–07.

 Obviously, however, this letter did not comply with Fleming's instructions. Marchesani Aff. ¶ 7 (also indicating that K–Mart never received copies of any letters sent to Powers' carriers).

26. This list contained the names of motor carriers that K–Mart recommended its ocean carriers use. Marchesani Aff. ¶ 2.

27. Fleming was aware that Peter Hogan (SIL) owned U.S. Intermodal. K–Mart, he asserts, designated U.S. Intermodal at Hogan's request but would have designated SIL if Hogan had requested it. Fleming Aff. ¶ 15.

28. Martin Hogan (SIL) had informed Fleming (K–Mart) that SIL had lost the K–Mart account from YM because it refused to pay Powers' administrative fees. Fleming Aff. ¶ 13. Fleming requested SIL's rates. He received not only the rates but also a copy of Peter Hogan's 7/22/91–dated letter to Chou. *Id.* K–Mart then found out that Powers was still charging the administrative fee despite its instructions not to do so. *Id.* ¶ 14. Accordingly, it decided to drop Powers' approved carriers from its new pier drayman list. *Id.*

*Simpson,* however, is problematic. The plaintiffs in that case raised both federal and Georgia RICO claims. The court noted that federal RICO requires only a preponderance of evidence, but held that the plaintiffs had failed to "come forward with proof that shows the required predicate acts and the pattern of criminal conduct." 227 Ga.App. at 653, 490 S.E.2d 184.

Georgia's RICO statute, in contrast, requires a clear and convincing standard of proof because its treble/punitive-damage and attorney fee components can be equated, impact-wise, to Georgia's punitive damages statute, which itself requires clear and convincing evidence. *Id.* at 655–56, 490 S.E.2d 184. The *Simpson* plaintiffs failed to meet that standard, so their Georgia RICO claims failed, too. *Id.* at 656, 490 S.E.2d 184.

■ Generally, federal courts should look to intermediate State court precedent where the State's highest court has not yet ruled. *See Veale v. Citibank, F.S.B.,* 85 F.3d 577, 580 (11th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997); *see also Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 177–78, 61 S.Ct. 176, 85 L.Ed. 109 (1940) ("[a]n intermediate state court in declaring and applying the state law is acting as an organ of the state, and its determination, in absence of more convincing evidence of what state law is, should be followed by a federal court in deciding a state question").

So, this Court ordinarily would give *Simpson* due regard, but all that changes where "persuasive data" exists that the Georgia Supreme Court would reject *Simpson*'s reasoning and reach a contrary conclusion. *See Doyle v. Volkswagenwerk Aktiengelellschaft,* 81 F.3d 139, 143 (11th Cir.1996); *West v. AT & T Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

"Persuasive data" exists here. First, Simpson is physical (hence, nonbinding) precedent as two of the three *Simpson* judges concurred in its judgment only. *See* Ga.Ct. App.R. 33(a); *Starks v. Robinson,* 189 Ga. App. 168, 172, 375 S.E.2d 86 (1988). Second,

the *Simpson* court correctly noted that federal RICO plaintiffs must prove their case by a preponderance of the evidence. *See Bieter Co. v. Blomquist,* 987 F.2d 1319, 1320–21 (8th Cir.) (collecting cases from other circuits), *cert. denied,* 510 U.S. 823, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993). Recognizing that Georgia courts often follow federal RICO decisions, the *Simpson* court nevertheless refused to do so because "the Georgia RICO is both broader in parts and narrower in parts." 227 Ga.App. at 655, 490 S.E.2d 184. Since, to reiterate, *Simpson* is nonbinding precedent, whether other Georgia courts will follow *Simpson*'s clear and convincing standard, as opposed to the federal preponderance of the evidence standard, is the issue this Court must decide.

SIL cogently argues for the latter. In reaching its result, *Simpson* focused primarily on the penal nature of the Georgia RICO statute's treble damages component. But the Georgia Supreme Court has specifically recognized the "compensatory goal" of the Georgia RICO Act. *Dee v. Sweet,* 268 Ga. 346, 349, 489 S.E.2d 823 (1997).

Furthermore, *Simpson*'s rationale—that the "stigma of quasi-criminal liability" of damages warrants a higher standard of proof—was specifically rejected by the U.S. Supreme Court with respect to the federal RICO statute. A federal civil RICO proceeding "leaves no greater stain than do a number of other civil proceedings." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 492, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

In addition, the Georgia RICO statute has provided for treble damages since it was enacted in 1980. The Georgia punitive damages statute (requiring "clear and convincing evidence") to which the *Simpson* court analogized, O.C.G.A. § 51–12–5.1, was enacted in 1987, and at that time the Georgia General Assembly did not alter the treble damages Georgia RICO component to conform it to § 51–12–5.1.

For that matter, the punitive damages statute provides that punitive damages are awarded "not as compensation to a plaintiff

but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51–12–51.1(c). Thus, the *Simpson* court's conclusion—that an award of punitive and treble damages under RICO serves the same purpose as the punitive damages statute—is plainly wrong. Punitive damages further RICO's goal of imposing sanctions, O.C.G.A. § 51–12–5.1(c), but treble damages further RICO's goal of compensating victims. *Dee,* 268 Ga. at 349, 489 S.E.2d 823.

Accordingly, this Court rejects *Simpson*'s clear and convincing standard for proof of a Georgia RICO violation. "Persuasive data" demonstrates that the Georgia Supreme Court would reject *Simpson*'s analysis and instead apply the same standard as the federal courts—preponderance of the evidence.

## B. Standing

■ Defendants maintain that SIL lacks standing to bring this action because it did not have a contractual right to haul every load of K–Mart freight from the ports of Savannah to the distribution centers. *See* doc. # 145 at 21; # 150 at 13. "[B]ecause plaintiff had no contractual right or other legal right to move [YM/K–Mart] containers, it cannot claim the alleged loss of potential [YM/K–Mart] container traffic as a legal injury." Doc. # 145 at 22. SIL responds that the standing issue does not turn on whether SIL had a contractual right to carry the YM/K–Mart freight, but whether SIL lost a business opportunity. Doc. # 190 at 67–68.

■ "A plaintiff has standing to sue under RICO only if his injury flowed directly from the commission of the predicate acts." *Longino v. Bank of Ellijay,* 228 Ga.App. 37, 41, 491 S.E.2d 81 (1997) *(quoting Morast v. Lance,* 807 F.2d 926, 933 (11th Cir.1987)). Here, SIL contends that it was injured by

the loss of contracts it would have obtained but for the alleged administrative fee racketeering activity. In similar RICO cases, federal courts have determined that the plaintiffs had standing even though they did not necessarily have a full fledged property interest (i.e., formal contractual right) in the contracts they claimed to have lost.

In *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335 (2nd Cir.1994), for example, the plaintiff was the low bidder on thirty-six municipal construction contracts that it did not receive because of the racketeering activity (alleged Hobbs Act violations) of the defendants. *Id.* at 1343. The defendants argued that the plaintiff could not recover for those lost contracts because it did not have a property interest in them. *Id.* Rejecting that argument, the Second Circuit concluded that the plaintiff had federal RICO standing even though it did not have a vested property interest in the unawarded contracts. *Id.*[29]

Although a Georgia court has not directly addressed this issue, one case has reached a similar result. In *Maddox v. Southern Engineering Co.,* 216 Ga.App. 6, 453 S.E.2d 70 (1994), the plaintiff owned land which would have increased in value had a dam and reservoir been constructed near it. The court allowed the plaintiff to assert a RICO claim alleging that the defendants conspired to provide governmental entities with false information to ensure that the dam and reservoir were built on a competing site. *Id.* at 7–8, 453 S.E.2d 70. This result is consistent with the result in *Terminate* and *Environmental Tectonics.* It also underscores the hollowness of the defense argument here; under it, for example; the *Maddox* plaintiff would not have had standing for lack of a contractual right to have the dam built on his property. SIL therefore has standing here.

## C. Legality of Powers' Request for Administrative Fees

■ Powers also pursues summary judgment on the ground that the commissions or

**29.** *Accord Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1066–67 (3rd Cir. 1988) (RICO plaintiff had standing to seek damages against defendants for allegedly influencing the award of a Nigerian defense contract through the bribery of Nigerian governmental officials; court rejected argument that plaintiff lacked standing to bring these claims because it could not show that but for the defendants' illegal conduct it would have received the defense contract); *Bieter,* 987 F.2d at 1327–30 (finding cognizable injury in developer's claim that it had lost a project to a competitor because of bribes paid to local officials).

administrative fees that it attempted to collect from SIL were not illegal.[30] Doc. # 145 at 17–19. At all relevant times, Powers insists, it was a property broker licensed by the Interstate Commerce Commission. Plus it had entered into a contract with SIL to provide SIL with freight shipments. Doc. # 145 at 17–18. That contract, it contends, "properly provided for modest commissions to be paid to Powers whether in the schedule of charges or in the body of the agreement itself." *Id.* at 18.

Therefore, Powers concludes, its collection of administrative fees and/or commissions for freight that it provided to motor carriers was completely legal. *Id.* There is only one problem with that, SIL contends: Powers never provided SIL with the YM/K–Mart freight. Hence, a jury would be authorized to find that Powers' attempts to extract administrative fees or commissions from SIL violated the Hobbs Act and constituted attempted extortion under O.C.G.A. § 16–8–16. Doc. # 190 at 53–60.

As noted above, SIL and Powers entered into a contract in 1990—the "Interstate Contract"—under which "[SIL] agree[d] to transport by motor trucks and [Powers] agree[d] to tender to [SIL] for such shipment, quantities and types of goods between the points of origin and destinations all as set forth in [SIL's] Schedule of Actual Rates and Charges ... attached hereto...."[31] Doc. # 187 Exh. 42 ¶ 1. Powers was to compensate SIL for its services pursuant to a rate schedule attached to the contract. *Id.* ¶ 4. The end of the contract contains a section entitled "Administrative Fee * * Container Carriers" which provides: "To offset D.J. Powers in-house cost associated with generating bills of lading, we have decided to implement an administrative fee." *Id.*, last attachment.

Powers maintains that the "only freight shipments it tendered to SIL ... were pursuant to contracts entered into by Powers and SIL." Doc. # 145 at 18. Accordingly, it argues that it was entitled to the administrative fee under the parties' contract. *Id.* SIL contends, however, that Powers never tendered this freight to SIL; instead, SIL was already hauling it for YM when Powers demanded that SIL pay it commission fees. Doc. # 190 at 49.

The record evidence shows that SIL began hauling for YM around 1986 or 1987, serving as a YM "house carrier." Hogan dep. vol. I at 286; Collins dep. at 46– 47. Until May of 1991, SIL was handling between 85% to 100% of YM's freight through the Port of Savannah. *See* Hosey Aff. ¶ 4 (doc. # 187 Exh. F); McNair Aff. ¶ 8 (doc. # 187 Exh. E).

Powers does not dispute SIL's factual contention that Powers did not control the YM/K–Mart freight at the time Herb demanded that SIL pay Powers administrative fees. Instead, it seeks to refute SIL's contention that "to be a property broker one must 'control the cargo' and 'bring the business' to the motor carrier." Doc. # 195 at 5. It seems to argue that it was entitled to demand such fees from SIL merely by being a statutorily authorized broker.

Powers' argument is completely baseless. A broker is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 10102(1). Although § 10102(1) does not require that the broker "control the cargo," the language characteriz-

---

30. YM and Solar adopt Powers' arguments on this issue. Doc. # 150 at 16.

31. In their briefs the parties reference a 1988 SIL—Powers contract which provided that Powers would "sell and arrange transportation on behalf" of SIL in exchange for a commission. *See* doc. # 190 at 49, # 145 at 18 n. 30. The parties, however, fail to provide *adequate* citation

to that contract's location in the record, if indeed the parties filed it with the Court. *See U.S. v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in the briefs"). As the 1990 contract contains a provision showing that it supersedes the 1988 contract (doc. # 187 Exh. 42 ¶ 9), the Court will not consider the latter in any event.

es the broker's role as the person who arranges the transportation of cargo by a motor carrier.

Powers, however, has offered no evidence that it arranged for SIL to haul the YM/K-Mart containers. Nor does it rebut SIL's evidence showing that SIL had been hauling containers for YM prior to Herb's demand for administrative fees. Notwithstanding Powers' euphemistic labels (i.e., "administrative fee," "commission"), sufficient evidence authorizes a jury to find that Herb contacted SIL one day and demanded that SIL pay Powers money if it wanted to continue hauling YM/K-Mart freight. That, in turn, would support a further finding that Powers committed extortion and violated the Hobbs Act.

Powers next appears to argue—its brief is conspicuously obtuse on this point—that even if it did not arrange for SIL to haul the YM/K-Mart containers, it still performed services for SIL pursuant to their brokerage contract. *See* doc. # 195 at 5–10. Interestingly, it begins this argument by noting that SIL does not "dispute that duly licensed property brokers are entitled to collect commissions or administrative fees for the services they render." *Id.* at 5. Yet, Powers never turns the corner and identifies just what services it rendered to justify fees for SIL's hauling of the YM/K-Mart freight.

SIL, not surprisingly, insists that Powers simply "did not perform any services justifying payment of administrative fees." Doc. # 190 at 58. Employing sheer bluster, Powers responds that a "review of the record ... demonstrates the absurdity of" SIL's contention. Doc. # 195 at 7. The Court has reviewed the record; the absurdity here is in Powers' contention that it performed fee-justifying services for SIL on the YM/K-Mart freight.

Consuming even more pages of its brief, Powers folds in unconnected generalizations.

It contends, for example, that its DTD "performed or offered to perform [five different] services for its contract motor carriers." Doc. # 195 at 7. These services include: (1) obtaining freight for motor contract carriers; (2) reducing administrative processing time for contract carriers by issuing bill of lading information on containers handled through the DTD to the motor carrier prior to the arrival of the vessel; (3) providing sales and marketing of DTD services and the contract carriers through brochures, direct marketing, etc.; (4) saving time for the contract carrier through the use of a computer database to improve customer, motor carrier, and ocean carrier communication and coordination of pick up and delivery of containers; and (5) reducing customer service time for contract carriers by handling customer inquiries regarding location of containers, i.e., tracing and tracking. Doc. # 195 at 7–8.

Yet, Powers never connects any of that to the YM/K-Mart freight. It simply provides no legal support for its implicit argument that it is entitled to compensation for services it offered to but did not perform on freight that it never brokered on SIL's behalf. Nor can the Court consider services Powers actually performed for SIL, because not one of Powers' record citations link such services to the YM/K-Mart freight in question.[32]

### D. "Intermission"

Given the sheer density of this case, the Court will now pause to narrow the issues under F.R.Civ.P. 56(d). The record shows that Powers is a licensed broker and thus is entitled to earn commissions for freight that it brokers on behalf of a motor carrier. Likewise, it is entitled to collect fees for services that it provides to shippers and carriers.

SIL entered a "brokerage contract" with Powers whereby SIL agreed to haul goods

---

32. For that matter, SIL contends that Powers performed no tracing and tracking services of any value to the motor carriers or anyone else. *See* doc. # 190 at 16. Powers fails to rebut this, and the testimony of K–Mart representatives indicates that Powers already performed tracing and tracking services for K–Mart as part of Powers' customs house broker role. L. Peterson Dep. at 77–78.

tendered by Powers, Powers would pay SIL an agreed rate, and SIL would pay Powers an administrative fee. SIL hauled K–Mart containers for YM, however, prior to the formation of that contract. Powers' demand for a fee on that freight therefore lacked any legal basis.[33] There is simply no evidence that Powers tendered the YM/K–Mart freight to SIL, or that it performed any services for SIL which would otherwise entitle it to a fee.

## E. Predicate Acts

■ The Georgia RICO Act makes it unlawful for any person, through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or property of another. O.C.G.A. § 16–14–4(a). In addition, no person shall "conspire or endeavor" to violate any provision of the Act. *Id.*

A "pattern of racketeering" is defined as "engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission" or which are otherwise "interrelated by distinguishing characteristics." O.C.G.A. § 16–14–3(8). The last of these incidents must occur within four years of a prior incident of racketeering activity. *Id.*

O.C.G.A. § 16–14–3(9) enumerates a multitude of "incidents" that constitute "racketeering activities," the so-called predicate acts central to this discussion. To this end, SIL has alleged that the defendants have engaged in attempted theft by extortion, O.C.G.A. § 16–8–16; § 16–4–1. Because the Georgia RICO Act incorporates any conduct defined as predicate offenses by the federal RICO statute, *see* O.C.G.A. § 16–14–3(9)(A)(xxix), SIL contends that defendants' racketeering activity also includes mail fraud, wire fraud, and Hobbs Act violations.

Defendants argue that summary judgment is proper because SIL cannot establish the necessary elements to prove two predicate acts. SIL cannot show, they insist, attempted extortion or conspiracy to extort under either Georgia or federal law; nor can SIL support its mail and wire fraud claims.

### (1) Extortion and the Hobbs Act

SIL alleges that defendants engaged in attempted theft by extortion and conspiracy to commit theft by extortion. In addition, SIL maintains that the defendants violated the Hobbs Act. In its 12/6/96 Order, the Court ruled that SIL's Hobbs Act, extortion, and conspiracy allegations constitute but one predicate act. Doc. # 38 at 6–8.

### (a) Extortion

Pursuant to O.C.G.A. § 16–8–16(a)(3), a person commits theft by extortion "when he lawfully obtains the property of or from another person by threatening to ... [d]isseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute." Instead of responding to SIL's argument that Powers tried to extort money—thus "property"—from SIL, Powers mixes apples with oranges by recycling its "standing" argument. It contends that, because SIL had no contractual right to move K–Mart containers for YM, it "cannot prove any 'property right' or interest in the movement of K–Mart containers." Doc. # 145 at 26. Thus, Powers concludes, SIL's extortion claim fails because SIL cannot establish proof that defendants attempted to obtain SIL's "property." *Id.*

That, of course, is not the issue, and SIL properly responds that the property Powers sought to extort was not the right to haul K–Mart containers but money (the so-called "administrative fees"). Doc. # 190 at 60. Again, Herb demanded that SIL pay Powers money (the administrative fee) on its YM/K–Mart haulage or she would say unfavorable

---

**33.** Powers maintains that "SIL didn't have to pay Powers the commissions and administrative fees it contractually was committed to pay; it simply could elect not to render transportation services arranged by Powers." Doc. # 195 at 12.

Once again, however, Powers offers no evidence that it arranged for SIL to handle the YM/K–Mart freight. The Court's patience has been worn thin by counsels' makeweight, paper-churning arguments.

things about SIL to deprive SIL of that business. Hogan dep. vol. I at 142–43, 154, 159. Powers has not refuted Hogan's testimony. Accordingly, a jury issue exists whether Powers, through Herb, committed extortion, and that establishes the extortion component of the first predicate act.

#### (b) Hobbs Act

The above-illuminated evidence similarly authorizes a jury to find that Powers violated the Hobbs Act. That Act prohibits an individual from obstructing, delaying; affecting, or attempting or conspiring to obstruct, delay, or affect the commerce or movement of any article or commodity in commerce. 18 U.S.C. § 1951(a). Hence, "it is a crime to obstruct or affect interstate commerce by obtaining the property of another through extortionate means." *U.S. v. Haimowitz,* 725 F.2d 1561, 1571 (11th Cir.1984). The act therefore prohibits attempted extortion, *id.* at 1572; *U.S. v. Albertson,* 971 F.Supp. 837, 841 (D.Del.1997), which is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Fear of economic loss falls within the scope of the Hobbs Act. *Haimowitz,* 725 F.2d at 1572; *Albertson,* 971 F.Supp. at 841.

Again, SIL has adduced sufficient evidence to authorize a jury finding that Powers attempted to obtain property (the commissions/administrative fees) from SIL and other motor carriers by inducing or exploiting the fear of economic loss (i.e., by threatening to take freight away from the carriers and prevent them from acquiring any new business). A jury could find that (1) Herb demanded that SIL pay Powers a commission on its YM/K–Mart freight or she would fabricate "poor service" claims to obtain the K–Mart business from YM and thus from SIL, Hogan dep. vol. I at 142–43, 154, 159; and (2) Herb similarly squeezed other motor carriers, including Cocke Brothers, CSX Transportation, and Shuttle Express by exploiting the same fear of losing the K–Mart business. *See* Cocke Aff. ¶¶ 5, 8 (doc. # 187 Exh. A); Nelms Aff. ¶¶ 7–8 (doc. # 187 Exh. B); Fulmer Aff. ¶¶ 4–10 (doc. # 187 Exh. C).

SIL's Hobbs Act predicate therefore is established, and the fact that SIL and the other carriers did not have a formalized contractual right to haul the K–Mart freight for YM does not change this conclusion.[34] Thus, even if Powers had prevailed on its argument that SIL had failed to satisfy the elements of extortion under O.C.G.A. § 16–8–16, the alleged violations of the Hobbs Act would still supply the predicate act of extortion. To that end, the Court notes that none of the defendants have moved for summary judgment on the ground that SIL cannot assert Hobbs Act violations as a predicate act.

#### (2) Mail Fraud

■ SIL alleges mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, as another predicate act.[35] To maintain a mail fraud claim, SIL must prove (1) a scheme to defraud and

---

34. "[C]ontractual rights comprise only a part of the 'package' of rights which can form the basis of an extortion." *U.S. v. Addonizio,* 451 F.2d 49, 73 (3d Cir.1971) (holding that the defendants—city officials—had destroyed the right of contractors, engineers, and suppliers to expect that they will be awarded contracts when their bids are lowest by conditioning the award of employment on a 10% kickback).

Similarly, other courts define the term "property" under 18 U.S.C. § 1951(a) broadly. *See U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 862 F.Supp. 861, 865 (E.D.N.Y. 1994) ("property" includes a garbage collector's right to pursue the opportunity to collect from certain stops without his competitors threatening it with physical force). "Property" as used in the Hobbs Act "includes, in a broad sense, any valu-

able right considered as a source or element of wealth." *Id.* (quoting *U.S. v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir.1969)). *See also, Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 1996 WL 47167 *7 (E.D.Pa. Feb.2, 1996) ("A person is put in fear of economic loss . . . where his refusal to submit to the alleged extortionist's demands would subject that person to loss of some potential economic benefit, or to diminished opportunity to exploit an existing economic benefit").

35. SIL's Amended Complaint alleges that Powers, with YM's approval, "engaged in multiple interstate telephone conversations constituting mail/wire fraud in which SIL was falsely represented as a poor common carrier, which did not provide adequate service into the K–Mart facilities. . . . False representations [were made] . . . to

(2) the mailing of a letter or other "mail matter" for the purpose of executing the scheme. *InterAgency, Inc. v. Danco Fin. Corp.*, 203 Ga.App. 418, 426–27, 417 S.E.2d 46 (1992) (cites and quotes omitted). Concerning wire fraud, SIL must prove that defendants (1) participated in a scheme to defraud which (2) was furthered by the use of interstate transmission facilities. *See* 18 U.S.C. § 1343. A "scheme to defraud" is one which is "reasonably calculated to deceive persons of ordinary prudence and comprehension." *U.S. v. Brown*, 79 F.3d 1550, 1557 (11th Cir.1996).[36]

The defendants argue that SIL has presented no evidence of any mail or telephone calls to K–Mart containing any factual misstatements about SIL. Doc. # 150 at 23. SIL, however, points to the affidavit of Philip Abraham, a former traffic manager at the K–Mart Distribution Center in Ocala. Doc. # 190 at 61. Abraham maintains that Herb frequently called him to try to convince him to use Powers' DTD-selected motor carrier, ATF. Abraham Aff. ¶ 8 (doc. # 187 Exh. U). During these telephone conversations, Herb "constantly criticized SIL as a motor carrier with a very poor reputation for service, and attempted unfairly to blame SIL for many of the problems being experienced at the K–Mart Distribution Centers, including Ocala." *Id.* These calls continued until SIL was replaced by ATF as the motor carrier in December, 1991. *Id.*

Powers insists that these alleged statements cannot establish fraud because they were mere opinions, not factual representations. Doc. # 145 at 29. That, however, misses the mark. The focus at this point is not whether these statements were intended as fact or opinion, but whether they were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Brown*, 79 F.3d at 1557. Here, SIL maintains that Herb made these statements to

induce K–Mart to request that SIL no longer haul its containers. A jury could infer that the statements that Abraham claims Herb made to him could be reasonably calculated to obtain just such a result.

None of the defendants offer any direct evidence to refute SIL's contention that Herb made those calls to Abraham. Instead, YM and Solar point to the testimony of Linda Peterson and Pinkett, the K–Mart employees who made the decision in December of 1991 to direct YM and Solar to terminate SIL. Doc. # 150 at 26. Despite their SIL-termination decision, Peterson testified that no Powers, YM, Solar, or Carolina employee ever made representations to them about the quality of SIL's service, nor did anyone lobby K–Mart to terminate SIL. L. Peterson Dep. at 121–22, 124. Pinkett states the same with respect to YM and Solar employees. Pinkett dep. at 58–59. So, YM and Solar are correct here, but neither Pinkett's nor Peterson's testimony refutes Abraham's testimony concerning Herb's calls.

The defendants next assert that SIL lost its K–Mart business not because of Herb's alleged calls but because of Hogan's threatening calls. Doc. # 145 at 31; # 150 at 26–27. They cite to the language in the 12/17/91 fax indicating that Linda Peterson did not wish to receive any calls from SIL's president. *See supra* note 18. The fax, however, never states that SIL lost the K–Mart business because of the threatening telephone calls Peterson had received. *Id.* In fact, Peterson testified that she and Pinkett sent YM their "terminate SIL" fax because of "service failures." L. Peterson dep. at 114.

Defendants next argue that SIL's mail and wire fraud claims must fail because it cannot show that SIL detrimentally relied upon the alleged misrepresentations made in furtherance of the scheme. Doc. # 202; # 212. YM and Solar had previously made this same

---

the effect that SIL provided 'poor service,' that it did not have adequate computer facilities for handling the cargo, and other defamatory comments." Doc. # 47 ¶ 32.

**36.** Because of the similarities in the language of the two statutes, case law interpreting the mail fraud statute also applies to the wire fraud statute. *U.S. v. Giovengo*, 637 F.2d 941, 944 (3d Cir.1980).

argument in their Motion to Dismiss SIL's Amended Complaint. . Doc. # 55 at 10–13. Recognizing that the Georgia RICO statute does not require that a "plaintiff suffer direct harm for each and every alleged predicate act" but instead focuses on a "pattern" of illegal activity, this Court rejected YM's and Solar's argument. Doc. # 71 at 7 (5/19/96 Order) (quoting *InterAgency*, 203 Ga.App. at 424, 417 S.E.2d 46); *see also Simpson*, 227 Ga.App. at 653, 490 S.E.2d 184 (noting that, for a federal RICO claim, "[w]ire and mail fraud are similar in their essential elements, and [they] differ from common law fraud in that there is no necessity of reliance").

■ Defendants next point to *Security Life Ins. Co. v. Clark*, 229 Ga.App. 593, 494 S.E.2d 388 (1997), in arguing that a plaintiff must plead and prove detrimental reliance to state a claim for either mail or wire fraud under the Georgia RICO statute. Doc. # 202 at 2; # 212 at 2–3. Under *Clark*, a Georgia RICO plaintiff's

> injuries must flow from the commission of the predicate acts. This means that a private plaintiff who wants to recover under civil RICO must show some injury flowing from one or more predicate acts.... He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular act, no recovery lies for the commission of that act. This means that, when the alleged predicate act is mail or wire fraud, *the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.*

494 S.E.2d at 395 (cites and quotes omitted) (emphasis original).

Defendants focus on the underscored portion of the above excerpt, but fail to reconcile it with the preceding sentences or earlier Georgia precedent. Previously, Georgia courts emphasized that "[w]hile it is certain that a plaintiff in a civil RICO suit must show

an injury by reason of a violation of O.C.G.A. § 16–14–4, *see* O.C.G.A. § 16–14–6(c), there is no requirement that plaintiff suffer *direct* harm from *each and every* alleged predicate act introduced to show a pattern of racketeering activity." *InterAgency*, 203 Ga.App. at 424, 417 S.E.2d 46 (emphasis added).[37] That is because it "is the 'pattern' which must be shown, [cites], not that plaintiff was injured by each incident of which the pattern was comprised." *Id.* Thus, the *InterAgency* court allowed evidence of similar misleading mailings to third persons as predicate acts even though those mailings did not harm the plaintiffs.

*Clark* neither cites to nor purports to overrule the *InterAgency* decision. Furthermore, the *Clark* court limited its focus to the face-to-face mail or wire fraud solicitation context (e.g., where A, by wire or mail, fraudulently induces B to part with some money). Even at that, *Clark*'s wording can be harmonized with *InterAgency*. It concluded that a plaintiff "must show some injury flowing from *one* or more predicate acts ... [i.e., he] must show a causal connection between his injury and *a* predicate act." *Clark*, 494 S.E.2d at 395 (emphasis added). But a Georgia civil RICO plaintiff does not have to show injury from *every* predicate act alleged, just "*a* predicate act."

This Court reached the same result in a federal RICO action. After noting that the Eleventh Circuit requires a causal connection between a plaintiff's injury and a predicate act to recover for the commission of the act, this Court explained:

> Nothing in this proximate cause requirement, however, precludes the [plaintiffs] from establishing a pattern of racketeering activity by showing other predicate acts of mail and wire fraud that constitute a single scheme; or establish the existence of other similar schemes.... Thus, although the Plaintiffs can recover damages only from their own injuries, the Plaintiffs may plead

---

**37.** The plaintiff in *InterAgency* was a prospective purchaser of a travel agency who brought a Georgia RICO action against the defendant, alleging it had sent misleading brochures and documents concerning the services the agency could offer.

other acts of mail or wire fraud to establish a pattern of racketeering activity.

*Gore v. Eichholz,* 1992 WL 96316 \*5 (S.D.Ga. April 24, 1992) (unpublished). Accordingly, so long as SIL can show that it was injured from the other alleged predicate act of extortion, it does not also have to show injury resulting from the alleged predicate act of mail fraud.

█ Even if SIL were required to show injury resulting from the alleged mail and wire fraud, it would not necessarily be prohibited from asserting mail and wire fraud as a predicate act simply because the alleged misrepresentations were directed at a third party instead of at SIL. In that regard, both the *Clark* case and the federal case it cited are factually distinguishable.

The plaintiff in *Clark* alleged that the defendant insurance company committed mail fraud by marketing an insurance policy within Georgia without first complying with State laws and regulations. After concluding that the alleged actions were not sufficient to show a mail and wire fraud scheme to avoid compliance with State laws, the court noted that the plaintiff had failed to show that the harm he suffered—the wrongful rescission of his health insurance—flowed from such a scheme. The court focused on the fact that the plaintiff had no idea whether the policy had been filed with or approved by the State and that all the alleged acts of mail fraud occurred before the plaintiff had considered buying the policy.

Thus, the plaintiff showed no proximate cause—as signified by the fact that, in his face-to-face dealings with the defendant, he had not relied to his detriment on the defendant's alleged misrepresentations. The controlling dynamic is proximate cause—often, but not always, tied to detrimental reliance.

In this case SIL contends that the misrepresentations made by Powers to K–Mart were for the purpose of getting K–Mart to remove SIL from its "pier drayman" list as an authorized carrier. The whole point of the misrepresentations to K–Mart, SIL contends, was to harm SIL. This is enough for SIL to show proximate cause, albeit not hinged upon SIL's own detrimental reliance, given the circuitous path the intended harm took. Unlike in *Clark,* where the plaintiff simply could not tie any harm he suffered to the defendant's misrepresentations to the State Insurance Department (instead, the plaintiff's harm flowed from the defendant's wrongful rescission of the insurance contract at issue there), SIL has adduced evidence showing that it was harmed by Powers' alleged misrepresentations to K–Mart: SIL lost K–Mart's business. Accordingly, even though SIL may not have "relied" in any way upon the misrepresentations to K–Mart, it nevertheless was the target of those misrepresentations, and thus can trace (to a proximate cause level showing) its damages to them.

Other courts have concluded likewise. *See SJ Advanced Tech. & Mfg. Corp. v. Junkunc,* 627 F.Supp. 572, 576–77 (N.D.Ill.1986) (plaintiff's allegations established mail and wire fraud, even though the alleged misrepresentations were not made to the plaintiff but to a third party who acted upon them to the plaintiff's detriment). In *Junkunc,* a grandson split from the family business and started a competing business, at which time the family business began making false misrepresentations to third parties (potential customers) about the ability of the competing business to perform. The court rejected the defendant's argument that the misrepresentations must be shown to have directly defrauded the competing business; the plaintiff's mail and wire fraud claims established the predicate acts underlying the federal RICO claim. *Id.* at 576.

To that end, the *Junkunc* court emphasized that under the federal RICO statute a plaintiff need only show that it is a " 'person injured in [its] business or property by reason of' the predicate acts of mail and wire fraud." The plaintiff certainly fit the "person injured" description. *Id.* (citing 18 U.S.C. § 1964(c)) (emphasizing that the goal of the misrepresentations was to exclude plaintiff as a competitor). *See also Texas*

*Air Corp. v. Air Line Pilots Ass'n Int'l,* 1989 WL 146414 *5 (S.D.Fla. July 14, 1989) (unpublished) (allowing plaintiff to allege mail and wire fraud as a predicate act where the alleged misrepresentation was directed at a third party with the intent of injuring the plaintiff; "[n]othing in the [mail/wire fraud] statute exempts from prosecution persons who achieve fraudulent objective through the deception of third parties").

To summarize thus far, SIL is entitled to present to a jury its Georgia RICO claims based upon record evidence authorizing a jury to find that Powers violated the RICO statute. It did so by engaging in extortion, wire fraud, and conduct violating the Hobbs Act.

## F. Statute of Limitations

■ Defendants contend that SIL's claims are barred by the Georgia RICO statute's five-year limitations period. Doc. # 145 at 32; # 150 at 28. O.C.G.A. § 16–14–8 provides:

> Notwithstanding any other provision of law, a criminal or civil action or proceeding under this chapter may be commenced up until five years after the conduct in violation of a provision of this chapter terminates or the cause of action accrues.

■ This limitations clock begins to tick when a plaintiff discovers, or reasonably should discover, that he has been injured and that his injury is part of a pattern. *Blalock v. Anneewakee, Inc.,* 206 Ga.App. 676, 677–78, 426 S.E.2d 165 (1992) (citing *Bivens Gardens Office Bldg. v. Barnett Bank of Fla.,*

906 F.2d 1546, 1554–1555 (11th Cir.1990)), *cert. denied,* 206 Ga.App. 899 (1993).[38] SIL filed its Complaint on 7/22/96. Hence, if it knew or should have known of its RICO injuries prior to 7/22/91, then its claims are now barred. What is so easily stated, however, is not as easily understood. The focus at this juncture is whether SIL knew or should have realized before 7/22/91 that its injury was "part of a pattern" as required under *Blalock.* Given O.C.G.A. § 16–4–3(8)'s definition of a "pattern,"[39] the issue, then, is whether SIL knew or should have known (hereafter "knew") that its injury resulted from two predicate RICO acts committed by the defendants.

Pointing to Hogan's testimony, defendants argue that SIL "knew" of two RICO predicate acts prior to 7/22/91 because the following occurred before that date: (1) in conversations with him, Herb made extortionist threats[40] that Hogan considered illegal; (2) Hogan knew Herb was demanding commission payments from other truckers; (3) Hogan knew that Herb had contacted Solar's New York office and threatened to use Powers' influence to move the K–Mart business from YM to another steamship line; (4) Hogan knew that Herb had contacted Robert Frederick of Senator Line (an ocean carrier also carrying K–Mart freight) and fabricated claims about SIL's service problems to induce him to stop using SIL to haul K–Mart freight. Doc. # 145 at 40–41; # 150 at 35–36; # 196 at 10–11.

Defendants are partially correct. There is no dispute that SIL knew, prior to 7/22/91, that Herb was making alleged illegal extortionate threats and that this allegation if true

---

**38.** According to SIL, § 16–14–8's plain language provides for an alternative limitations period, one that begins when the RICO violation terminates. Doc. # 190 at 79. *Blalock* rejected this argument, albeit without explanation. SIL illuminates that fact in insisting that Georgia Supreme Court would not follow *Blalock* and instead would apply the alternative limitations according to the statute's plain terms. The Georgia Supreme Court, however, denied certiorari in *Blalock.* Thus, until the Georgia Supreme Court overrules *Blalock,* this Court is bound to follow that decision. *See Veale,* 85 F.3d at 580.

**39.** Section 16–14–3(8) defines a "pattern of racketeering activity" as "engaging in at least two incidents [predicate acts] of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics."

**40.** Defendants are conceding this point for the sake of their limitations argument only.

constitutes a predicate act. Indeed, Hogan testified about several such conversations with Herb. *See supra* pages 4–5; Hogan dep. vol. I at 142–43, 154, 159. SIL therefore "knew," prior to 7/22/91, of at least one predicate act—Herb's attempted extortion. Defendants, then, need only point to another predicate act that SIL "knew" about prior to 7/22/91 in order to show that SIL should have known that its injury was part of a pattern.[41]

To that end, the Court concludes, for the purpose of this motion, that another predicate act exists, and it arises from SIL's allegation that Powers attempted to extort commission fees from other overland carriers. *See* Amended Complaint ¶ 22. This suffices as a second predicate act. *See InterAgency*, 203 Ga.App. at 424, 417 S.E.2d 46 (where plaintiff alleged that defendant fraudulently induced him to enter contract for travel agency purchase, evidence that defendant fraudulently induced another to enter a similar contract could constitute a second predicate act); *State v. Shearson Lehman Bros., Inc.*, 188 Ga.App. 120, 122, 372 S.E.2d 276 (1988) (reversing dismissal of case where pattern of racketeering was alleged from "multiple transactions with numerous people").

However, defendants have not pointed to any evidence showing SIL's knowledge, prior to 7/22/91, that Herb was shaking down other carriers. Instead, they argue only that Hogan could infer—solely from Herb's threat that she would find another trucking company if SIL did not pay the administrative fee—that Herb "must have" been extorting others. Defendants, however, deposed Hogan and thus could have asked him if he made that inference; they refer this Court to no such deposition testimony showing that he did. Such inference, then, is not supported by the record.

Defendants next point to another predicate act which SIL, through Hogan, learned about during a conversation with Robert Frederick (Senator Line). They point to SIL's allegation that Herb called Frederick on or about 7/18/91 and urged him to switch from SIL to one of Powers' DTD carriers. Frederick Aff. ¶ 6 (doc. # 187 Exh. K). She highlighted Powers' sophisticated tracking system and claimed that SIL had a poor service reputation. *Id.* Although Herb at that time reminded Frederick of Powers' influence with K–Mart, thus implying that she might try to induce K–Mart to replace Senator Line, Frederick refused Herb's request to stop using SIL, *id.*, and his superior subsequently backed him up on that decision. *Id.* ¶ 7. Frederick then called Hogan to inform him about his conversation with Herb, as well as a fax that he wanted to send to Hogan concerning this subject. *Id.* ¶ 8.

Assuming that the Frederick–Hogan phone call conveyed the existence of a second predicate act,[42] the parties focus on when that call occurred. Hogan testified that it happened on 7/19/91 or 7/21/91. Hogan dep. vol. I at 166, 170. Not surprisingly, defendants underscore that point, contending that Frederick's call therefore put SIL on notice of a second predicate act prior to the 7/22/91 limitations deadline.

SIL, however, maintains that Hogan simply misspoke and that the conversation occurred on 7/22/91 (Monday), the date on which Frederick maintains that it occurred. *See* Frederick Aff., ¶ 8. Hence, SIL contends, it could not have known that it was harmed by a pattern of racketeering activity before 7/22/91. Doc. # 190 at 76. SIL explains that, during Hogan's deposition, the parties were unaware of the transmission data on the top of the fax. That data shows that the fax was not sent to SIL until 10:24 a.m. on 7/23/91 (Tuesday), even though the body of fax is dated 7/18/91 (the previous Thursday). *See* doc. # 187 Exh. T (copy of fax with transmission data). Hogan was "clearly con-

---

41. Of course, whether SIL should have known prior to 7/22/91 that it had been injured is a separate issue that the Court need not address at this point.

42. Defendants, however, fail to articulate just what type of predicate act they claim that to be. Arguably, Herb furthered her attempted extortion scheme, and possibly fit herself into the wire fraud statute, when she contacted Frederick (Senator Line).

fused," SIL maintains, "by counsel's failure to point out the date of actual receipt of the fax, [so he] mistakenly testified that he might have talked to Frederick on July 19 or July 21." Doc. #190 at 76. And, Hogan had referred to the date of the conversation as on a Friday or the following Monday, Hogan dep. at 170, so he simply misrecollected Monday's actual date (the correct date is 7/22/91).

■ Powers responds by invoking the summary judgment, inconsistent testimony rule. Because Frederick's affidavit directly contradicts Hogan's testimony, Powers would have this Court deem it a sham. Doc. #195 at 15 n. 10 (citing *Van T. Junkins & Assocs. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony")). The inconsistent testimony rule, however, applies to one witness's inconsistent testimony not conflicts between two witnesses.

For that matter, the rule permits an explanation for seeming inconsistencies, and SIL had done just that. Hogan first stated that he believed Frederick called him on the 19th (Hogan dep. vol. I at 166) and minutes later indicated that the call could have occurred on Friday the 19th or Monday the 21st. *Id.* at 170. Monday was actually the 22nd, so Hogan's testimony that Frederick call him on "Monday the 21st" shows that Hogan simply misrecollected what that Monday's date was. That is not legally inconsistent with Frederick's testimony (showing that he called Hogan on the 22nd), and nothing rebuts this. The record evidence therefore shows that, at the earliest, Frederick called Hogan on 7/22/91—five years before SIL filed this lawsuit. Therefore, defendants cannot prevail on these grounds.

■ In one last attempt to apply the limitations bar, defendants point to Hogan's testimony about the information he received from Solar's representatives. In April or May, 1991, they informed Hogan that Herb had contacted Solar's New York office and pressured them—by threatening to use Power's influence to move the K–Mart business from YM to another steamship line—into helping her extract Powers' administrative fees from SIL (i.e., she allegedly told Solar that Solar must use a trucking company that was willing to pay Powers an administrative fee or Solar would lose K–Mart's business). *See* Hogan dep. vol. I at 285–86, vol. II at 41–42; Mitchell Aff. ¶ 8 (doc. #187 Exh. S). That communication from Solar, defendants contend, shows that SIL had knowledge of the second, pre–7/22/91 act defendants need to invoke the RICO limitations bar.

Defendants' argument has some appeal here. A jury could find that Herb's pressure/threat to Solar violated the Hobbs Act, 18 U.S.C. § 1951. Although Powers was not seeking a monetary payment from Solar, it was attempting to extort "property" from Solar. As mentioned above, Hobbs Act property "is not limited to physical or tangible property," but includes, "in a broad sense, any valuable right considered as a source of or element of wealth." *Tropiano*, 418 F.2d at 1075.

And, Hobbs Act "property" has been found to include a garbage collector's right to pursue the opportunity to collect from certain stops without threats of physical force from his competitors, *Private Sanitation*, 862 F.Supp. at 865, as well as a union's right to nominate and vote for a union president without threats of violence. *U.S. v. Debs*, 949 F.2d 199, 201–02 (6th Cir.1991). Solar's right to choose what trucking company to use for YM's K–Mart freight falls within the Hobbs Act's definition of property.

So, defendants have succeeded in showing that Powers may have violated the Hobbs Act by (1) pressuring SIL to pay it a kickback and (2) pressuring Solar. But do those two Hobbs Act violations constitute two different RICO predicate acts or just one? If the answer is two, then defendants would prevail in showing that SIL should have

known its injuries were part of a pattern.[43]

The answer is one. Concededly, the issue is difficult to resolve because, instead of following the federal definition of a RICO pattern—a definition which refers to "acts" of racketeering activity—the Georgia General Assembly instead chose "incidents" of racketeering activity. *See* O.C.G.A. § 16–14–3(8). Moreover, it left it to the courts to define what constitutes an "incident."

The Georgia courts, in turn, have not specifically decided whether there is any distinction between "acts" and "incidents." In any event, this Court will look only to Georgia cases in determining whether the Powers/SIL and Powers/Solar Hobbs Act violations constitute two separate "incidents" forming a RICO pattern prior to 7/22/91.

█ Unfortunately, the Georgia cases have not been consistent. The Court does discern, however, a predominant theme: the two alleged predicate incidents[44] must be sufficiently "linked" to form a RICO pattern, but nevertheless sufficiently distinguishable so that they do not become "two sides of the same coin," *Raines v. State*, 219 Ga.App. 893, 894, 467 S.E.2d 217, *cert. denied*, 219 Ga.App. 913 (1996)—otherwise known as a mere "single transaction," instead of the two or more transactions or incidents (forming a pattern) that Georgia's RICO statute requires. *See Stargate Software Int'l, Inc. v. Rumph*, 224 Ga.App. 873, 877, 482 S.E.2d 498 (1997) (the taking and wrongful use of computer equipment and records is one single transaction even though the "elements of two crimes may have been present at two separate points in time"); *Raines*, 219 Ga.App. at 894, 467 S.E.2d 217 (the sale of timber land by a single deed cannot be broken down into the two predicate acts of theft by taking and filing of fraudulent documents; the issue is *not* whether party could have been charged with two separate criminal offenses); *Emrich v. Winsor*, 198 Ga.App. 333, 333, 401 S.E.2d

76 (1991) (the sale of a single investment to a plaintiff and co-investor did not constitute a pattern but simply a single transaction with two victims).

The dividing line is not always clearly drawn. The Georgia Court of Appeals recently did so in *Brown v. Freedman*, 222 Ga.App. 213, 474 S.E.2d 73 (1996). There the defendants provided an improper accounting on a promissory note in order to induce the victim into giving up the substantial gain then available in a house she had just inherited. *Id.* at 217–18, 474 S.E.2d 73. That was one separate incident or act, but it was linked to a second act—the defendants' conversion of the decedent's personal property found inside the home. *Id.*

Yet, the *Brown* court, which otherwise neatly contrasts with *Raines, Stargate,* and *Emrich*, did not reconcile its holding with that found in *Dover v. State*, 192 Ga.App. 429, 431–32, 385 S.E.2d 417 (1989) (*rejecting* a defense argument that, because the crimes of arson, making false statements to fire officials, and committing mail fraud all arose from "one incident"—the burning of a trailer—Georgia's criminal RICO statute did not apply; instead, defendants committed three separate incidents).

This Court views *Dover* as an aberration. In *Stargate*, for example, the defendants allegedly stole computers, data, and records from plaintiff, then later used the records. In concluding that the theft and later use of the records constituted one predicate incident, the *Stargate* court analogized that fact pattern to the sale of timber land, based on false reports and the filing of a false deed— all held by the *Raines* court to be just one incident. *Stargate*, 224 Ga.App. at 877, 482 S.E.2d 498. In reaching its decision, the *Stargate* court distinguished *Brown* as involving two separate and distinct acts: the improper accounting and post-foreclosure conversion of personal property. The latter act was sufficiently unrelated to the improper

---

43. At that point, the Court would have to decide if SIL should have known that it was injured before 7/22/91.

44. At this point the Court will use the terms "act" and "incident" interchangeably.

accounting. In other words, the improper accounting was not merely a step taken in unison with another to realize one wrongful "payoff"; rather, each act, though linked by the same general scheme, produced different "payoffs." It was in that sense that the two acts "were not one transaction but rather joined by the common link of a single foreclosure." *Id.*

Significantly, the *Stargate* court also failed to reconcile *Dover*, which, to reiterate, concluded that three alleged crimes constituted separate predicate acts even though they were all part of the same transaction aimed at one "payoff"—the burning of a building to collect the insurance (as compared to the two "payoffs" pursued by the defendants in the *Brown* case). In other words, all three of the illegal pursuits in *Dover* had to be conducted in order to collect the insurance proceeds, while in *Brown*, for example, there were two payoffs (the gain reaped on the improper accounting and a separate gain reaped by converting the personal property), with the inherited home serving as the common link. *Brown* illuminates the Georgia RICO model, while *Dover* muddles it.

Under *Stargate, Brown,* and *Emrich,* then, Powers' attempted extortion of Solar cannot serve as a separate predicate act from its attempted extortion of SIL. Rather, both incidents were merely a part of SIL's single extortion transaction, or two sides of the same coin. Powers needed Solar to put pressure on SIL to pay the administrative fees/commissions. Similarly, when Solar later pressured SIL to pay Powers the fees, Solar merely completed the same (hence, single) transaction. Accordingly, Hogan's knowledge of the pressure Powers put on Solar did not put SIL on notice of two predicate incidents prior to 7/22/91. The Court must therefore deny defendants summary judgment on statute of limitations grounds.

Admittedly, this statute of limitations analysis (i.e., whether Powers' attempt to extort Solar could constitute a predicate act) may be at odds with the Court's earlier analysis as to whether the alleged wire fraud constitutes a second predicate act. The defendants, however, have not argued that the alleged wire fraud could not constitute a separate predicate because it was part of the predicate act of extortion—the two sides of the same coin analysis. Perhaps, defendants neglected to do so because this Court's previous Orders did not address this specific issue, but instead concentrated on whether SIL had sufficiently pled the necessary elements of mail and wire fraud. The Court, however, is raising the issue now. Within 15 days of this Order, SIL and Powers shall brief the Court on the following issue: whether Powers' alleged acts of wire fraud constitute a predicate act separate from its alleged extortion of SIL, or did those acts constitute just one RICO transaction.

### G. RICO Conspiracy

 SIL has shown this Court no evidence demonstrating that YM or Solar committed any predicate acts under the Georgia RICO statute, O.C.G.A. § 16–14–4(a) & (b). It has not shown, for example, that these defendants committed attempted extortion, violated the Hobbs Act, or engaged in mail/wire fraud. SIL thus seeks to fit them within the RICO statute's conspiracy provision, § 16–14–4(c): "It is unlawful for any person to conspire or endeavor to violate [§ 16–14–4(a) or (b) ]."

No published Georgia cases examine § 16–14–4(c), so the Court will consult precedent examining the federal RICO Act's conspiracy provision, 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate [§ 1962(a), (b) or (c) ]"), which is very similar to the Georgia provision. A defendant can be found liable for violating § 1962(d)—which contains no overt act requirement—if he knowingly and willfully joins a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts. *See Salinas v. U.S.,* —— U.S. ——, ——– ——, 118 S.Ct. 469, 476–78, 139 L.Ed.2d 352

(1997).[45] Hence, it does not matter if the defendant himself committed any predicate acts, so long as he knowingly and willfully joins a conspiratorial scheme which contemplates that a co-conspirator will do so. *Id.* 118 S.Ct. at 477 (indeed, an individual "may be liable for conspiracy even though he was incapable of committing the substantive offense").

In *Salinas,* for example, the court upheld the RICO conspiracy conviction of a jail deputy (Salinas) who knew about and agreed to facilitate a bribery scheme (an inmate bribed the sheriff and Salinas for arranging contact visits with his wife and girlfriend), even though, by acquitting him of the substantive offense, the jury necessarily found that only his co-conspirator committed the two predicate acts. Because, under the common-law rule of conspiracy, a conspirator may be liable even if he did not agree to commit each and every part of the substantive offense, it follows that those who provide support for a RICO scheme are as guilty as the perpetrators. *Id.* 118 S.Ct. at 476–77.

Here the Court must determine whether YM and Solar agreed to participate in Powers' racketeering enterprise and thus to the commission of two predicate acts. YM and Solar contend that there is no evidence showing their conspiratorial participation in Powers' kickback scheme, much less to commit wire fraud in furthering it. Doc. # 150 at 16–21, 27–28. The record would authorize a jury to find that YM, Solar, and Carolina in fact were aware that (a) Powers pressured SIL for its administrative fee and (b) Hogan

informed them of his belief that such fee was illegal.[46] SIL insists that these defendants, involvement went beyond mere knowledge of Powers' scheme. YM/Solar, SIL contends, agreed to Powers' demands and replaced SIL over SIL's failure to pay Powers its administrative fee. This, SIL maintains, was essential to the success of Powers' attempted extortion of SIL. Doc. # 190 at 66–67.

To that end, SIL refers this Court to testimony showing that YM/Solar made their "dump SIL" decision under Herb's pressure. Doc. # 190 at 42–43. Hogan testified that, when he spoke with Seow (Solar) sometime after K–Mart sent its 12/17/91 fax, Seow disclosed Solar's concern over losing the K–Mart business. Hogan dep. vol. II at 45, 62–64. While Solar "did not go along with it and agree with it," Seow stated, "they were being forced into selecting another trucker." *Id.* Hogan encountered a similar response from Collins, who also acknowledged the fact that SIL had lost the business because of pressure from Herb. Collins indicated that Solar would try and mitigate the loss by finding SIL other hauling business. Hogan dep. vol. I at 190–92, vol. II at 47–49.

Finally, SIL underscores the fact that YM/Solar never investigated K–Mart's "declining service" complaint about SIL, contrary to Solar's general policy. Doc. # 190 at 43–44; *see also* Seow dep. at 65–66 (such complaints ordinarily would be investigated, and that would include speaking with the carrier); Wimberly dep. at 61–63 (same). SIL thus argues that YM/Solar discontinued using SIL because SIL would not pay Pow-

---

45. Although not decided by the Supreme Court, lower courts have concluded that § 1962(d) applies to civil RICO cases. *See, e.g., Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990). While the statute itself does not distinguish between civil and criminal RICO conspiracy cases, lower courts reached this result in part because of the Supreme Court's instruction to construe RICO broadly. *See U.S. v. Marmolejo,* 89 F.3d 1185, 1197 & n. 19 (5th Cir.1996) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)); *US v. Neapolitan,* 791 F.2d 489, 495 (7th Cir.1986) (same). Accordingly, this Court will apply *Salinas* to this action.

46. Hogan made several calls to various representatives of YM to tell them about Herb's demand for a commission/fee and threats to have SIL replaced. *See* Hogan dep. vol. I at 147, 149–50, 155–56; Seow dep. at 71–72. Seow and Collins individually confirmed that Herb had made calls to Solar to pressure YM about SIL. Hogan dep. vol. II at 41–42. Daniel Mitchell (SIL) also recalls Collins mentioning that "SIL should go along with the rebate scheme because YM was concerned that YM might lose the K–Mart business if the commissions were not paid." Mitchell Aff. ¶ 8 (doc. # 187 Exh. S).

ers the commissions/fees it demanded. Thus, SIL concludes, while YM/Solar may not have committed the predicate acts, they certainly joined a conspiracy aimed at helping Powers commit them.

The problem with SIL's theory, however, is that it at most shows YM/Solar joining a conspiracy to commit just one predicate act. *See Neibel v. Trans World Assur. Co.*, 108 F.3d 1123, 1128 (9th Cir.1997) (RICO conspiracy consists of "an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least *two* predicate acts") (emphasis added). SIL does not, for example, show that YM/Solar knew about, much less assisted, Powers in its scheme to extort from other trucking companies or to commit mail/wire fraud. YM/Solar's largely passive compliance with Powers' pressure play on SIL at most shows that they joined a conspiracy to commit but one predicate act.[47] Accordingly, SIL cannot prevail on its claim that YM and Solar conspired with Powers to violate the Georgia RICO Act.

### H. Jurisdiction

YM removed this case to federal court because it is an agency of a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. §§ 1330 et seq. *See* doc. # 1. Under this Court's analysis, however, YM will no longer be a party in this case, so FSIA would no longer support jurisdiction. Nor does diversity jurisdiction exist because Powers and SIL are both Georgia corporations.

Nevertheless, because the Court has "conducted significant proceedings so as to become familiar with the case, the parties, and the subject matter," it is inclined to retain jurisdiction over the case despite its dismissal of YM. *See* 16 Moore's Federal Practice, § 106.66[3][a] (3d ed.1997) (providing factors courts should consider in retaining jurisdic-

tion). In an abundance of caution, however, SIL and Powers also shall brief this Court on this question.

### IV. CONCLUSION

Defendant D.J. Powers Company, Inc.'s ("Powers") motion for summary judgment (doc. # 144) is *DENIED,* while the summary judgment motion filed by defendants The Yang Ming Line ("YM") and Solar International Shipping Agency, Inc. (doc. # 149) is *GRANTED.* Within 15 days of the date this Order is served, plaintiff Southern Intermodal Logistics, Inc. ("SIL") and defendant Powers shall file a brief limited to the following issues: (a) jurisdiction, *see supra* Part III(H); and (b) whether the alleged mail and wire fraud discussed supra constitutes a separate predicate act. *See supra* Part III(F) at 52–53.

Finally, any reconsideration motion (*see supra* note 47) must be filed within 15 days from the date this Order is served, and each party may reply within 10 days thereafter. The parties shall file a proposed Consolidated Pretrial Order ("PTO") within 25 days of the date this Order is served. They shall confer and include within the PTO as many factual *stipulations* as they in good faith can reach. The PTO's witness list shall be accompanied by a summary of each witness's testimony. Each factual summary (*see* PTO form ¶¶ 9, 13) shall be one page. In contrast, the PTO must not contain any rehashed legal arguments already resolved by the Court.

---

**47.** Given the sheer length and density of the record, which is now 221 documents long, the Court would be receptive to a SIL reconsideration motion aimed at showing the Court what evidence, if any, supports a two-predicate act (or more) conclusion. The parties are reminded that every factual assertion in their briefs shall be followed by a citation to the record.